404 P.2d 91

**Murray BELSHE, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Mahout Construction Co., Inc., J. T. Smith Company, and J. T. Smith, Respondents.**

**No. 8245.**

Supreme Court of Arizona,

In Division.

July 16, 1965.

Robert K. Corbin, Phoenix, for petitioner.

Edgar M. Delaney, Phoenix, for The Industrial Commission of Arizona, respondent.

UDALL, Justice.

This appeal by certiorari is from a decision upon a motion for rehearing of an order affirming findings and award entered by the Commission on January 20, 1964, denying compensation for the loss of sight of the right eye of petitioner.

Murray Belshe will be referred to hereinafter as "petitioner", the defendant-employers as "respondents", and the Industrial Commission as the "Commission".

The facts are that on October 30, 1962, while the petitioner was employed by respondents at Payson, Arizona, petitioner struck the front part of his head, about two inches over his right eye, on a 2 x 4 scaffolding. The force of the blow knocked him down. Immediately thereafter a sizeable lump appeared upon the forehead of petitioner at the place where the injury occurred. The accident was reported to respondents' foreman immediately after it happened and it was observed by one Douglas Powell, a fellow employee. Immediately thereafter petitioner experienced a severe headache, which he claims was caused by the accident. Petitioner continued to work at his employment until the evening of November 2, 1962.

Petitioner returned to his home on November 3, 1962, and when he awoke on the morning of November 4 he was nearly blind in both eyes. For several days after the accident he had a severe headache in the area where his head struck the scaffolding. The testimony shows that from November 4th the sight of the left eye began to improve, and in the course of four or five days thereafter the vision of his left eye was restored to normal.

Thereafter petitioner filed a claim with the Commission and in due course the Commission made findings and award that petitioner's loss of vision in his right eye was noncompensable. Thereupon petitioner filed his notice of protest of award and made application for a rehearing. On November 15, 1963 a formal hearing was held and on November 22, 1963 the referee made his report affirming the findings and award of April 3, 1963. Objections to the referee's report were filed and the matter was submitted for review and decision. Again the Commission affirmed the previous award of April 2, 1963 denying petitioner compensation for the loss of his right eye.

It is the contention of petitioner that the evidence submitted by the petitioner at the hearing on November 15, 1963 showed that the loss of the sight of petitioner's right eye was the result of the injury sustained on October 30, 1962 during the regular course of petitioner's employment.

The evidence is uncontradicted that on October 30, 1962, petitioner—while in the course of his employment—sustained an injury to his forehead as heretofore recited. It is also uncontradicted that immediately after the injury the petitioner suffered severe headaches which continued for several days thereafter. The petitioner testified that he had never had this type of headache before. The evidence also shows that on the morning of the 4th of November when petitioner awoke he found that he was nearly blind in both eyes; that some five days later the petitioner regained the sight of his left eye.

The principal and only question to be determined in the case is whether petitioner lost the sight of his right eye as a result of the injury, or whether the loss of his vision was caused by hardening of the arteries or a thrombosis which brought about an occlusion of the central retinal artery of petitioner's right eye.

Respondents and the Commission contend that loss of the vision of petitioner's right eye was caused by hardening of the arteries. To substantiate their contention, Dr. Harry J. French, an ophthalmologist who examined the petitioner on February 2, 1963, testified that in his opinion there was a "thrombosis of the central retinal artery" or "occlusion of the central retinal artery." "Both eyes exhibited a certain amount of attenuation." This is consistent with what is called hardening of the arteries or arterio-sclerosis. He did not attribute the bump as having caused all these profound changes in the eye. He testified "there is no possible way for a blow or trauma to produce such extensive damage in the eye." The only conclusion he could arrive at was that "indigenous or metabolic changes within his own system could produce such profound and extensive changes."

Dr. French also testified that the metabolic changes could have been caused by "high cholesterol, heredity, toxic poison in the system." He admitted that he made no tests to determine if there was high cholesterol in the petitioner's system, nor did he make any tests or inquiry to determine if petitioner had any toxic poison in his system at the time of the injury. Likewise, he did not make inquiry of petitioner to determine if heredity could have been a cause that brought about damage to the eye at the time of the alleged injury.

The following questions were propounded to the doctor and answers made:

"Q   He did tell you that since the injury he sustained until he lost the sight of his eye he was suffering continuously from headaches all that time, isn't that true?

"A   Yes, I think he did but I don't see how the loss of vision of the eye could produce headaches.

*     *     *     *     *     *

**300**

"Q You mention as part of the pathology he had exotropia?

"A Yes.

"Q How long does this generally take to produce?

"A Usually from two to three months, to show itself. He also had optic atrophy which takes two to three months to show up.

"Q If a man was subjected to the type of trauma that Mr. Belshe suffered, could this exotrophia develop any quicker?

"A No, the exothrophia was because he had no vision, and trauma played no part, in my opinion.

"Q I believe in the comments you stated you found this optic atrophy was either a postoptic neuritis or the result of a vascular accident?

"A Yes, thrombosis of the central retinal artery.

* * * * * *

"Q You say it takes two or three months for this exotropia to present itself and also two or three months for this optic atrophy to present itself?

"A Yes.

"Q Your examination was on February 2, 1963, over three months

after the injury had occurred. Isn't it possible that this injury had occurred and during the two or three months that the eye had turned out and the atrophy had presented itself and your examination was over three months after the date of the accident, isn't it possible this could have happened during the time before you examined him?

"A I will answer it this way: I can't say that the accident was or there was enough changes within the eye, nontraumatic, to produce optic changes. I can't give an affirmative answer.

"Q I am just a layman, Doctor, and let me ask you this way, if I may: Assuming there was an occlusion of this eye causing the sight to leave the right eye, that would cause disuse?

"A That is right, that is the most probable sequence of events.

"Q From the disuse, the muscles wouldn't be functioning, which would weaken the muscles and it would turn out to be an extrophia which presented itself?

"A Yes.

"Q It would take about three months?

"A That is right.

"Q If the accident happened on October 30, 1962, and you examined him on February 2, 1963, approximately three months after the accident, this exotrophia could have happened, since he went blind in his right eye, between that and the date you examined him?

"A That is probably true.

"Q Would your statement be the same as to the optic atrophy? Could that also happen that way, too?

"A Yes.

The doctor also testified that where blinded, as a result of hardening of the arteries, the blood supply has been cut off and where that occurs for any length of time it will die permanently. He testified in this case that the blindness in the right eye was permanent.

"Q Assuming he woke up the same way, he woke up and couldn't see out of his right or left eye and later got back the complete sight in his left eye?

"A I would have to question that, myself, because if he had an occlusion in the other eye, it wouldn't come back.

"Q If it was hardening of the arteries that caused that?

"A With all the manifestation he had it wouldn't come back that quick because I have here my refraction of 20/20, read small print with proper glasses.

"Q If he had hardening of the arteries which caused the loss of sight in his right eye and assuming if he lost the sight in his left eye at the same time, it would have to be hardening of the arteries of the left eye, too?

"A Of course, there, again, I didn't look in his eye but he has evidence of hardening of the arteries in the other eye.

"Q You say if he had hardening of the arteries in both eyes and lost the sight of both eyes due to that, he wouldn't get his sight back?

"A No, he wouldn't get it back; he might have gotten a little hysterical or pacicky.

"Q If the testimony shows he was completely blind in both eyes when he woke up on Sunday morning and later got complete sight back in his left eye, that would not indicate hardening of the arteries?

"A It would not? He has it in both eyes.

"Q You said that if he had hardening of the arteries he would lost the·

sight of his eye and it wouldn't come back?

"A    If he has got a complete occlusion, put it that way, occlusion of the main artery inside the eye.

"Q    Mr. Belshe does have in his right eye a complete occlusion?

"A    Yes.

"Q    He should not be able to see anything?

"A    Nothing.

\*    \*    \*    \*    \*    \*

"Q    If he has hardening of the arteries which caused the occlusion which caused him to go blind, you are saying he can never get his sight back?

"A    That is right.

"Q    If he can never get his eyesight back, he is completely blind in this eye?

"A    That is right.

\*    \*    \*    \*    \*    \*

"Q    At the time you examined him on February 2d, he could see nothing?

"A    That is what he claims.

"Q    Your test showed he could see absolutely nothing?

"A    That is right."

Dr. Lorenzen, an ophthalmologist, who was called by the petitioner, testified that to determine whether a person has hardening of the arteries in the eye, one would have to have a "combined analysis of the small vessels of the eye and the blood chemistry and blood pressure and other general results of tests." The record shows that Dr. French did none of these things except to look into the eye of the petitioner. Dr. French was of the opinion that a blow or trauma such as petitioner sustained could not cause the loss of the sight of the eye, whereas Dr. Lorenzen testified that "optic atrophy or blindness in a person's eye can be caused by 'trauma' so slight as a blow on the forehead with a potato", and "an incidental and apparently trivial fall into a hedge." Both Dr. Lorenzen and Dr. French agree that the "optic atrophy" or exotropia found in petitioner's right eye was caused by the shutting off of blood to the eye at the time of the occlusion. Dr. Lorenzen, however, is of the opinion that the occlusion could have been caused by "trauma," whereas Dr. French insists that the cause could not be trauma but that the occlusion was caused by arterial sclerosis. Dr. French is firm in his opinion that if the occlusion was caused, as he says it was in this case, by hardening of the arteries, then the petitioner has lost the sight of his right eye forever.

Counsel then asked the following question and received the following answer:

"Q  If he has sight in his right eye it wouldn't be hardening of the arteries.

"A  If he has it; but he doesn't have it."

The undisputed fact, however, is that on June 24, 1963, Dr. Lorenzen examined the petitioner and found that he could see out of his right eye and was able to count fingers. Further, at the time of the hearing before the Board on November 15, 1963, the petitioner, in the presence of the referee, demonstrated that he could see out of his right eye. Therefore there is no competent testimony in the record showing that the partial loss of the right eye was not due to the accident of October 30, 1962.

Dr. Lorenzen explained how a blow on the forehead can cause blindness such as was sustained by the petitioner in his right eye. He testified it would take about five days from the time of the injury for the sight of the eye to be lost. He further testified that the severe headaches felt by the petitioner after October 30th would indicate that the blow was severe enough to cause hemorrhaging within the sheaf of the optic nerves, which would cause the occlusion. If the hemorrhaging caused the occlusion in the course of four or five days, that not only would account for the severe headaches experienced by the petitioner but would account for the atrophy and exo-tropia found in petitioner's eye when he was examined by Dr. French some three months after the accident.

We have held that when there is no substantial evidence to support the crucial finding of the Commission, that said finding is clearly erroneous and the award of the Commission should be set aside. Jenkins v. Industrial Commission, 77 Ariz. 377, 272 P.2d 601 (1954). There is no competent evidence in the record which shows that the loss of the sight of petitioner's right eye was caused by thrombosis of the central retinal artery and was the result of hardening of the arteries or "arterial sclerosis", since Dr. French admits that if that was the cause the sight would be permanently lost. Equivocal testimony cannot create a conflict in medical testimony. Rahar v. Industrial Commission, 94 Ariz. 170, 382 P.2d 656 (1963); Helmericks v. Airesearch Manufacturing Co. of Arizona, 88 Ariz. 413, 357 P.2d 152 (1960). On the other hand, the testimony of Dr. Lorenzen shows that a trauma could have caused the loss of the sight of the right eye. His testimony is corroborated by the testimony of Dr. Helmes since he admitted that it is possible for a head injury such as was sustained by the petitioner to cause blindness.

We therefore conclude that the Commission had no credible medical evidence before it upon which to base its

award of no compensation. Where this is the case the award will be set aside. Rahar v. Industrial Commission, supra.

Award set aside.

LOCKWOOD, C. J., and McFARLAND, J., concurring.