535 P.2d 623

**STATE COMPENSATION FUND and Pima County Board of Supervisors, Petitioners,**

v.

**INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Lloyd W. Fickett, Respondent Employee.**

**No. 1 CA–IC 1183.**

Court of Appeals of Arizona,
Division 1,
Department C.

May 6, 1975.

Rehearing Denied June 4, 1975.
Review Denied July 1, 1975.

Robert K. Park, Chief Counsel State Compensation Fund by Arthur B. Parsons, Phoenix, for petitioners.

Edward F. Cummerford, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Rabinovitz & Minker, P. C. by Bernard I. Rabinovitz, Tucson, for respondent employee.

NELSON, Presiding Judge.

On June 19, 1972, Lloyd W. Fickett (respondent) filed a claim with the State Compensation Fund (petitioner) for workmen's compensation benefits for an injury suffered by him in the course and scope of his employment as an Assistant County Attorney for the Pima County Board of Supervisors (employer). The State Compensation Fund denied the claim by Notice of Claim Status issued April 18, 1973. Respondent filed a timely request for hearing; hearings were held on December 13, 1973 and January 8, 1974, following which the hearing officer issued his Decision Upon Hearing and Findings and Award for Non-Compensable Claim. Thereafter respondent filed a Request for Review to which petitioner filed no response. On June 4, 1974, the hearing officer changed his award, issuing his Decision Upon Review Reversing Decision Upon Hearing for Non-Compensable Claim Entered On March 22, 1974, and Findings and Award for Compensable Claim. It is of the June 4, 1974 decision that petitioner seeks review.

The reversal on review by the hearing officer of his own prior decision forms the basis for petitioner's first question presented. Does failure to respond to a Request for Review constitute confession of error requiring reversal by the hearing officer of his decision? In the present case this question, if answered in the negative, raises a further question: must we set aside the decision of the hearing officer on review based on the assumption that the hearing officer reversed his decision because the State Compensation Fund failed to respond to the motion?

 To the first part of this question, our answer is in the negative—failure to file a response to a request for review does not constitute a confession of error. A.R.S. § 23–943.A, pertaining to requests for review, was amended in 1973 to include the

language "Failure to respond will not be deemed an admission against interest." While this language was not present in the statute at the time this claim was commenced (June 19, 1972), it was present at the time the Request for Review was filed (April 22, 1974). Inasmuch as A.R.S. § 23–943.A involved a matter of procedure, we view the statute as amended in 1973 to be applicable from the effective date thereof to all cases in which requests for review were filed thereafter. See Merchants Despatch Transp. Corp. v. Arizona State Tax Commission, 20 Ariz.App. 276, 512 P.2d 39 (1973); Miami Copper Co. v. State, 17 Ariz. 179, 149 P. 758 (1915); A.R.S. § 1–244.

While we agree with the petitioner as to the issue of failure to respond to the Request for Review, we do not agree that the decision upon review must therefore be set aside on that basis. The petitioner urges that the following language used by the hearing officer in his Decision Upon Review implies that improper reliance was placed upon the absence of a response:

"Thereafter, although entitled to so do, neither the insurance carrier nor the employer filed a response to said Request for Review."

We note that the language used was "entitled" as opposed to "required". This language does not create any such clear inference as the petitioner suggests. Other language used in the Decision Upon Review supports a contrary conclusion as to the rationale behind the decision of the hearing officer:

"This hearing officer, *having fully reconsidered the file, records and all matters hereunto appertaining,* including the Request for Review and Memorandum filed by the applicant on April 22, 1974, now enters Decision Upon Review. . . ." (Emphasis added)

and further:

"Whereas, in the original Decision in this case the Hearing Officer interpreted the medical testimony to indicate a conflict, it is apparent upon reconsideration that there is no real conflict in medical evidence."

These statements indicate that the hearing officer did not base his decision upon any mistaken view that the petitioner was confessing error by not responding to the Request for Review, but upon the fact that he now believed that there was no conflict in the medical testimony.

The second and greater question here is whether respondent's heart problems were causally related to an injury by accident within the meaning of Arizona Workmen's Compensation Law. To determine this issue we need to consider the factual setting as found by the hearing officer:

"2. The applicant began his employment with Pima County as an attorney in January of 1968 and was assigned to the Pima County Juvenile Court Center. In December of 1969 his duties at the Juvenile Center were reduced to three days a week and he was assigned to spend Thursday and Friday of each week in County Attorney duties at Ajo, Arizona, some 130 miles west of the City of Tucson. The applicant would work the first three days of each week at the Juvenile Center in Tucson and on Thursday morning he would depart for Ajo and return to Tucson either Friday night or Saturday morning. Transportation to and from Ajo was by county-owned vehicle driven by him. The applicant continued to work in this manner from December 1969 until November 1971 when his duties at Ajo were terminated. On February 19, 1971, a Friday, the applicant had departed Ajo for Tucson at approximately 9:00 p. m. At an intersection of the highways known as Three Points some twenty-two miles west of the City of Tucson, the applicant was involved in a one-car accident, in which a pedestrian was killed. Investigations of this accident by the County Attorney's Office, the Department of Public Safety and by the State Attorney General's Office lasted from two to three months. The applicant states that he was advised

that the case was being investigated for possible felony manslaughter charges against him.

"3. The applicant had originally scheduled his monthly vacation for 1971 for the month of July. During May of 1971, he felt tired and exhausted and requested that his vacation be changed from July to June. He began his vacation on or about June 1, 1971, and except for two days, June 24 and 25, Thursday and Friday, when it was necessary for him to appear in a Superior Court case in Ajo, he continued his vacation until the end of the month. The applicant's first difficulty that he relates to the alleged industrial injury occurred on Monday night, June 21, 1971. Some time during that night he woke up and states that he was in terrible pain and had a difficult time breathing.

\*　\*　\*　\*　\*　\*

"On Wednesday, June 24, 1971 . . . he had pains in the chest, arms and leg and had a difficult time breathing. At that time, an appointment was made with his family physician, Simon Marcus, M. D., for the following Saturday, June 26, 1971. On Thursday, June 24, the applicant drove to Ajo, keeping his Superior Court appointments there and returned to Tucson Friday evening, June 25. He reported to Dr. Marcus on Saturday morning, June 26, 1971, where Dr. Marcus gave him a thorough examination, including electrocardiogram, fluroscopic [sic] examinations and blood tests. Since that time the applicant has had repeated bouts of chest pain and pain in the left arm which are relieved by nitroglycerin tablets and the use of oxygen which he keeps in his office and at home. In the latter part of December 1971, he was hospitalized at Tucson Medical Center and was in the intensive care unit for three days, following which he was discharged with the diagnosis of congestive heart failure.

\*　\*　\*　\*　\*　\*

"5. The applicant's testimony indicates that he had no difficulty in his duties prior to the incident in which the pedestrian was killed. Following that episode, when he would pass the spot enroute to or from Ajo, he would become nauseated and would have what he described as 'the dry heaves.' The testimony of a deputy sheriff who worked with the applicant while at Ajo and the testimony of a court referee who worked with the applicant at the Juvenile Court Center corroborates the testimony of the applicant in that to them his health appeared to decline after the death of the pedestrian. . . ."

This set of facts seems to reveal a rather classic case of precipitous emotional trauma followed by a continuing period of stress, culminating in an injurious result becoming manifest at an ascertainable time. (The February 19, 1971 accident involving the death of the pedestrian, followed by stress from overwork, the anxiety of being under pressure for possible felony prosecution, resulting in the chest pains of June 21, 1971.) It is petitioner's position that these facts do not support a finding that respondent suffered an accident by injury, since the accident here was to the pedestrian, not to respondent, and the respondent suffered no injury as a result of that incident. Before reaching the question of causal connection between the February 21, 1971 incident and the disabilities respondent eventually came to suffer—always a difficult matter in heart cases, particularly when the results do not immediately follow the industrial event—we note that numerous jurisdictions have awarded workmen's compensation for heart injuries when the cause is mental, nervous, psychic or emotional rather than physical, holding that the resulting heart condition is an "injury" within the meaning of the workmen's compensation statutes. See 1A, Larson's Workmen's Compensation Law, § 38.65.

■ Arizona is among that majority which recognizes that a nonphysical event may constitute an "accident" and the result an "injury". In Brock v. Industrial Commission of Arizona, 15 Ariz.App. 95, 486 P.2d 207 (1971), this Court considered the

very question presented here, in a factual framework nearly identical to the one here. Brock suffered a pre-existing depressive anxiety; while working he struck and killed a woman; he was suspended from work during investigation of the accident; ultimately was terminated; and the effect of all this was to worsen his pre-existing mental condition. The following language from the *Brock* decision is appropriate here:

"[T]he concept of what is an 'accident' has been the subject of frequent consideration by our courts, and it is now commonly viewed to include any unexpected injury-causing event, so long as it is work-connected. [Citations omitted] Here, petitioner unwittingly ran down and killed a pedestrian. Since the collision was unintended, necessarily it must have been as unexpected to the petitioner as to the deceased. We cannot perceive any logical basis for viewing the pedestrian's injury stemming from this unexpected event as an accidental injury to the pedestrian, and viewing as different the mental injury sustained by the petitioner when causally related to the same event. In this connection, the Commission found, or at least assumed, the necessary causal relationship, but denied petitioner's claim on the basis that a disability arising from severe emotional reaction to an unexpected event unaccompanied by physical force or exertion *is somehow* different. If there is a difference, it is one that eludes this Court. Nor can we perceive anything in the Arizona authorities we have examined requiring that we now judicially engraft such an exception upon the all-inclusive language of our statute. Indeed, such an unnecessary construction would be overly restrictive and contrary to the clearly expressed intent of the workmen's compensation act. [Citations omitted]" 15 Ariz.App. at 96, 486 P.2d at 208.

Petitioner urges that Shope v. Industrial Commission of Arizona, 17 Ariz.App. 23, 495 P.2d 148 (1972) is incompatible with *Brock* and should be followed. In *Shope* the claimant's job had become increasingly difficult for him to handle; one day he became involved in an argument with a customer and became so upset he left the shop and was unable to return; he was fired that afternoon. The Court discussed and distinguished the *Brock* decision, stating:

"The evidence here reveals no unexpected injury-causing event but rather a buildup of emotional stress for a period of years preceding the day that petitioner walked off the job. The conflicts which petitioner experienced were part of the usual, ordinary and expected incidents of his employment. As respondent argues in its brief, to grant petitioner his requested relief would literally open Pandora's Box permitting compensation to any disgruntled employee who leaves his job in a huff because of an emotional disturbance." 17 Ariz.App. at 25, 495 P.2d at 150.

We view the facts in the case before the Court to be similar to those in *Brock*; the death of the pedestrian and the ensuing investigation were unexpected injury causing events, not of a usual, ordinary or expected nature.

Given that a disability caused by emotional stress may be an injury by accident within the meaning of our statutes, we are still left with the issue of causation.

"Where causation is peculiarly within the knowledge of medical experts as in heart attack cases we must rely upon the opinion of medical experts to determine when an accident has occurred and its cause. Waller v. Industrial Commission, 99 Ariz. 15, 406 P.2d 197 (1965); Continental Casualty Co. v. Industrial Commission, 15 Ariz.App. 565, 489 P.2d 1267 (1971). And an industrially related accident does not have to be *the* cause of the injury or death, but merely *a* cause. If a worker's job precipitated or accelerated a heart attack, there is a causal connection between the employment and the worker's death. Russell v. Industrial Commission, 98 Ariz. 138, 402 P.2d 561 (1965); Tatman v. Provincial Homes, 94

Ariz. 165, 382 P.2d 573 (1963)." McNeely v. Industrial Commission of Arizona, 108 Ariz. 453, 455, 501 P.2d 555, 557 (1972).

The hearing officer accurately summed up the medical testimony presented to him, in his finding #11:

"11. . . . Dr. Dubin relates the onset of the pain to the accident in which the Indian was killed and the period of stress which followed thereafter. Dr. Marcus, in his letter, relates the pain to the same episode although in his testimony he moves more toward a possible rather than a probable relationship. Dr. Schocket interprets the chest pain to be the applicant's reaction to his environment. Dr. DeSando, in answer to a question on an insurance form, indicated the applicant's heart condition to be possibly related to his employment. Dr. Sanderson refers to the patient's anginal pattern as being distinctly atypical and refers to a cardiovascular instability of questionable etiology."

Based upon this evidence, the hearing officer came to the following conclusion:

"12. Whereas, in the original Decision in this case the Hearing Officer interpreted the medical testimony to indicate a conflict, it is apparent upon reconsideration that there is no real conflict in the medical evidence. The opinions of Doctors Dubin and Marcus indicate a probable relationship between the applicant's angina pain and the industrial episode wherein the Indian was killed and the stress resulting therefrom while the opinions of the other three doctors are expressed in possibilities rather than probabilities. Equivocal testimony cannot create a conflict in the evidence." [Citations omitted]

■ This conclusion of the hearing officer that because the opinions of three of the doctors were expressed in terms of possibility and that therefore their testimony was equivocal and consequently created no conflict is erroneous and requires the award to be set aside.

The hearing officer apparently misunderstood the law as to what is meant by "equivocal" testimony. "Possibility" may merely express that a likelihood is something less than 50%; "probability" something more than 50%; but the testimony in each instance may be equally unequivocal. "Equivocal", as defined in Webster's New Collegiate Dictionary (1974), refers to that which is "subject to two or more interpretations"; to "equivocate" means "to avoid committing one's self in what one says". Arizona case law is consistent with such definitions of "equivocal", and the rule that equivocal testimony cannot create a conflict is not necessarily applied merely because testimony is couched in terms of "possibility". (See Helmericks v. Airesearch Mfg. Co. of Arizona, 88 Ariz. 413, 357 P.2d 152 (1960), wherein the Court held that the Commission was free to reach either conclusion as to causation where the testifying physician spoke in terms of possibilities. Cross v. Industrial Commission of Arizona, 81 Ariz. 222, 303 P.2d 710 (1956), wherein the medical witness testified that causation was attributable to one of three possibilities and the Court held that it could not compel the Industrial Commission to adopt a particular possibility.)

The rule is recited in instances where the doctor keeps changing his mind. (See Rahar v. Industrial Commission of Arizona, 94 Ariz. 170, 382 P.2d 656 (1963), wherein the doctor expressed one opinion, reversed himself, retreated to his initial position, then said he needed to conduct a further examination.) It has also been recited where the opinion of the doctor was necessarily based on facts not present in the case. See Belshe v. Industrial Commission of Arizona, 98 Ariz. 297, 404 P.2d 91 (1965).

■ However, a doctor's opinion does not have to be positive in order to have some value as evidence. Apache Powder Co. v. Bond, 61 Ariz. 184, 145 P.2d 988 (1944); Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649 (1936).

See also: Belshe v. Industrial Commission of Arizona, supra. This is particularly true in heart cases, as opposed to cases involving broken bones or external injuries of a more obvious nature. Continental Casualty Co. v. Industrial Commission of Arizona, 15 Ariz.App. 565, 489 P.2d 1267 (1971); Carson v. Industrial Commission of Arizona, 7 Ariz.App. 372, 439 P.2d 535 (1968). In cases such as the one before us now, positive knowledge cannot be had as to causation, and when this is true, the fact that one opinion is expressed more positively than another does not make it the duty of the trier of fact to give it more weight than the other. Continental Casualty Co. v. Industrial Commission of Arizona, supra; Meeks v. Industrial Commission of Arizona, 7 Ariz.App. 150, 436 P.2d 928 (1968); Almanza v. Phelps Dodge Corp., 57 Ariz. 150, 112 P.2d 215 (1941).

 By this holding we have not said that an award of compensation may be based solely upon possibilities and speculative testimony. Clearly our courts have consistently held that such is not the law in Arizona. Russell v. Industrial Commission of Arizona, 98 Ariz. 138, 402 P.2d 561 (1965). We are only holding that in cases such as the one before us now, testimony of a less than positive degree must be considered in combination with all other evidence and given what weight, if any, the trier of fact deems warranted. See Royal Globe Insurance Company v. Industrial Commission of Arizona, 20 Ariz.App. 432, 513 P.2d 970 (1973); Zaragoza v. Industrial Commission of Arizona, 8 Ariz. App. 236, 445 P.2d 184 (1968).

If the hearing officer had reached the same conclusion after considering all the evidence, giving more weight to the testimony of Dr. Dubin, the award would stand. This Court does not weigh the evidence before the Commission; the hearing officer is at liberty to resolve all conflicts and draw warranted inferences. Arnott v. Industrial Commission of Arizona, 103 Ariz. 182, 438 P.2d 419 (1968); Waller v. Industrial Commission of Arizona, 99 Ariz.

15, 406 P.2d 197 (1965); Zaragoza v. Industrial Commission of Arizona, supra. In this case, however, the hearing officer's findings indicate that he failed to consider all of the relevant evidence before him, and we must therefore set the award aside.

The one remaining question, that of the timely filing by respondent of his claim, we view to have been properly resolved by the hearing officer. He found that the Industrial Commission had jurisdiction to consider the claim since it was filed within one year of the time when the injury became manifest, though not within a year of the time of the initial accident (the death of the pedestrian). McGee v. San Manuel Copper Corporation, 89 Ariz. 244, 360 P.2d 1024 (1961); Mead v. American Smelting & Refining Co., 1 Ariz.App. 73, 399 P.2d 694 (1965). The evidence supports his conclusion.

The award is set aside.

STEVENS and WREN, JJ., concur.