550 P.2d 246

Jerry SLAYTON, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Respondent,

Station Krux, Respondent Employer,

Chubb/Pacific Indemnity Insurance, Respondent Carrier.

No. I CA–IC 1410.

Court of Appeals of Arizona, Division 1, Department C.

June 3. 1976.

Rehearing Denied July 27, 1976.

Review Denied Sept 14, 1976.

Harlan J. Crossman, Phoenix, for petitioner.

John H. Budd, Jr., Chief Counsel, Industrial Commission of Arizona, Phoenix, for respondent.

Jones, Teilborg, Sanders, Haga & Parks, P.C., by William R. Jones, Jr., and Joseph L. Moore, Phoenix, for respondents employer and carrier.

## OPINION

NELSON, Judge.

This petition involves a claim for workmen's compensation benefits based upon the aggravation of an underlying and pre-existing skin condition known as exfoliative erythrodermatitis. Jerry Slayton (Slayton), the petitioner herein, was employed by the respondent employer, Station KRUX (KRUX), as an advertisement salesman from January 6, 1974 through June 4, 1974, when he was hospitalized by Peter Lynch, M.D., a dermatologist in Tucson.

On September 3, 1974, Slayton filed a claim for workmen's compensation benefits for an alleged injury by accident arising out of and occurring in the course and scope of his employment. On September 24, 1974, Chubb/Pacific Indemnity Insurance, the carrier for KRUX (Carrier), denied the claim by Notice of Claim Status. Slayton timely sought a hearing, which was held in two segments on April 28, 1975 in Tucson and on May 22, 1975 in Phoenix. On June 18, 1975, the hearing officer issued his Decision and Findings and Award for a Non-Compensable Claim. A review was sought before the hearing officer. After he affirmed his Award for a Non-Compensable Claim on September 3, 1975, the matter was brought here on certiorari.

We affirm the award of the Industrial Commission of Arizona.

## OCCUPATIONAL DISEASE

■ This case, insofar as occupational disease questions are concerned, is governed by the Workmen's Compensation Statutes as amended when the Arizona Occupational Disease Disability Act was repealed. See generally: Chap. 53, § 1, Laws 1973; A.R.S. §§ 23-901(9)(c), 23-901.01-901.05; Comparative Table, 8 A.R.S., Ann.Pocket Pt., page 243. The hearing officer found —and we do not perceive any serious objection to that finding—that exfoliative erythrodermatitis is not an occupational disease within the definitions and requirements found in A.R.S. §§ 23-901(9)(c) and 23-901.01, supra. According to the medical testimony, it is an idiopathic disease (no known cause). In any event, Slayton had the skin condition for some 20-plus years prior to his employment with KRUX.

■ The Carrier would have the Court go further and hold that the statutory revision of 1973, supra, somehow weakened the authority of cases such as: *In re Mitchell,* 61 Ariz. 436, 150 P.2d 355 (1944); *Treadway v. Industrial Commission,* 69 Ariz. 301, 213 P.2d 373 (1950); *English v. Industrial Commission,* 73 Ariz. 86, 237 P.2d 815 (1951); *Dunlap v. Industrial Commission,* 90 Ariz. 3, 363 P.2d 600 (1961), et al., which treated as compensable under the Workmen's Compensation Act disabilities caused by diseases not enumerated in the old occupational disease statute, but caused or aggravated by accident or some special or unusual exposure. See also: *Enyart v. Industrial Commission,* 10 Ariz.App. 310, 458 P.2d 514 (1969). We have been cited to no cases, nor to any legislative history, which would indicate an intention to overrule or change the law stated in these decisions. Indeed, a casual review of the comparative tables, supra, indicates a clear intention to liberalize, rather than restrict, the coverage of truly occupationally related diseases. The only concepts not retained in some form

in the statutory changes were some of the most severe limitations and restrictions on recovery, related primarily to silicosis and asbestosis, found in former sections A.R.S. §§ 23-1107, 23-1243, 23-1244, 23-1245. We do not believe the result urged by the Carrier was intended by the Legislature, nor is it mandated by more recent decisions of this Court and the Supreme Court of Arizona. Cf. *Featherman v. Industrial Commission,* 112 Ariz. 52, 537 P.2d 922 (1975); *Harbor Insurance Company v. Industrial Commission,* 25 Ariz.App. 610, 545 P.2d 458 (1976).

## THE WORKMEN'S COMPENSATION ISSUE

■■ The question to be resolved, then, as viewed by both the hearing officer and this Court, is whether Slayton's preexisting and underlying skin disease was aggravated by an injurious accident arising out of and in the course of his employment within the meaning and scope of the Workmen's Compensation Statutes, A.R.S. § 23-901. Viewing the evidence in a light most favorable to sustaining the award of the hearing officer, *Micucci v. Industrial Commission,* 108 Ariz. 194, 494 P.2d 1324 (1972), there is ample support, both in the evidence and in the law which he applied to the evidence, to support the conclusion that Slayton's skin condition had naturally progressed to a point of deterioration and was not causally related to his employment with KRUX.

The history of Slayton's skin disease is not in conflict to any great extent, and while there are certain discrepancies in the testimony of the various physicians as to the exact times the various symptoms were observed, we do not believe, in view of our resolution of the case, that any of these minor differences are material. The best recitation of the agonizing history of Slayton's disease is from his own testimony:

"1950, when I got out of the service, friends of mine noticed that my hands itched, as I'm scratching them now, that

I had scaly skin and a nervous habit of scratching, as I'm now doing.

"Dermatitis was noted on my discharge papers by the discharging physician of the United States Marine Corps at Treasure Island in San Francisco in 1952 or '50, I forget which. My skin was very sensitive to changes of temperature, and living in the Bay area, anybody knows that there is considerable change of temperature, even though there isn't a wide variance of, well, degree reading of the thermometer. So if it is the least bit cold, my hands turn very blue; the least bit of sunshine, they get very red.

\*   \*   \*   \*   \*   \*

"Through the 1950's my skin condition progressed very slowly; itching, scaling continued. I saw various dermatologists, who haven't kept their records over the years and all apparently to no avail because none of them could help me.

"In 1960 I moved to Arizona and at that time my skin started to pick up what you would call an inflammation or mild sunburn appearance. At that time I could still perspire.

"In 1964, we moved to Northern Arizona, and I noticed at that time that I started to lose little tiny patches of my hair.

"Then we moved to Ventura, California, and I noticed that I was unable to perspire, that I was losing my hair faster, and little pus marks were evident around the hair follicles of my legs. In other words, in each pore there would be a little particle of pus, and then pretty soon the hair was all gone from my legs.

"We moved back to Arizona in 1967. I lost all of my hair. My sweat glands were destroyed. . . .

\*   \*   \*   \*   \*   \*

"In '67, I met Dr. Seymour Shapiro, who turned out to be the first decent and honest dermatologist that I had met to that date. I hate to be unfair to the profession of dermatology because I have an extremely tough case, but he biopsied me, consulted with every member of his staff, and they came up with a diagnosis of retiform parapsoriasis, and he told me at that time, he said that this very well could lead in later life to lymphoma, Hodgkins disease, leukemia and things of this nature.

\*   \*   \*   \*   \*   \*

"In 1969, they had a Southern Arizona convention of dermatologists   .   .   . among which was Dr. Sultzberger, and the reason I cited the name is that he's from the Presidio in San Francisco and he's known to be Mr. Dermatologist in the United States.

\*   \*   \*   \*   \*   \*

"His statement [Dr. Sultzberger's] was that the type of thing that I have he had only seen on boys that had come back from the Pacific or from the Far East. [Slayton served in Korea for more than a year in the early 1950's].

\*   \*   \*   \*   \*   \*

"[In 1969 I'd] lost all my hair, sweat glands were destroyed, skin was very flaky, continuously coming off.

\*   \*   \*   \*   \*   \*

"Dr. Shapiro put me on salt baths for my dry condition and required me to use Vaseline every day, covering my entire body with Vaseline before going to work in the morning.

\*   \*   \*   \*   \*   \*

"I moved to Phoenix in 1969   .   .   . My oldest boy married a doctor's daughter [Dr. Clyde Flood, who referred Slayton to Dr. John Amos, who treated him initially in Phoenix. At this time Slayton was discovered to have Hodgkins disease].

\*   \*   \*   \*   \*   \*

"I went into Doctors Hospital, and I believe it was June 6, 1970. The operation was performed. It was an enlarged lymph node. It was malignant; therefore, it was Hodgkin's disease.

"A hematologist was called in to explain to my wife and I all of the options and all about Hodgkin's disease and things of this sort.

\*  \*  \*  \*  \*  \*

"Through the period June, July, August and September of 1970, I received stomach exploratory, liver wedge biopsy, splenectomy, radical removals of enlarged lymph nodes under both arms, on both sides of my neck, two lymphangiograms and a series of cobalt treatments at Good Samaritan Hospital—and all of the time that this was going on, I was working . . . I never missed a check. [Slayton worked for radio station KRDS from 1969 until he went to work for KRUX in January, 1974. The Hodgkin's disease was cured, or at least arrested.]

\*  \*  \*  \*  \*  \*

"I had no further medical problems. I still had the skin condition. I mean that is something that certainly isn't going away and that is something—a discomfort that you just learn to live with. You take a shower every morning, put on Vaseline every morning and you go to work every morning. It's not pleasant. You carry it [Vaseline] in your car so that when your face is too dry and you look too bad and you go in to call on a client, you stop and put [it] on. . . .

"In 1972, I went to the UCLA Medical Center for a 30-day checkup.

\*  \*  \*  \*  \*  \*

"They found the Hodgkin's disease stage 2B to be inactive, and they used a skin treatment that—called occlusion, which seemed to help, and I came back and I was very, very pleased with the whole situation.

\*  \*  \*  \*  \*  \*

"I got along good. I worked every day; everything went fine.

"On January 6, 1975 [sic], I resigned my post at KRDS [to go to work for KRUX].

\*  \*  \*  \*  \*  \*

"I did well until April 14 [1974] and then a large ulcer developed on my right side, and in order to work so that my belt would not rub against it, I used to put medication on it, a Telco pad and an Ace bandage so that I could continue doing my job, because I was doing quite an excellent job. I was working long hours. I had set goals for myself and I was achieving the goals.

\*  \*  \*  \*  \*  \*

"Ulcers started to develop on my back. They grew. Brown drainage started to flow from the ulcers. I got very weak. They became incrusted.

"I went to Tucson to see Dr. Shapiro on May 31 [1974] . . . [Dr. Shapiro immediately referred Slayton to Dr. Peter Lynch].

\*  \*  \*  \*  \*  \*

"I saw Dr. Lynch on June 4. He immediately put me in the hospital. That was June 4, 1974. From that date on I have been totally . . . disabled."

Three doctors testified at the hearings: Dr. Peter Lynch and Dr. Eugene Leibsohn, two eminently qualified dermatologists, and William F. Bunting, M.D., the hematologist primarily responsible for arresting or curing Slayton's Hodgkin's disease. Although there were some discrepancies in the histories and observations of the three physicians, i. e., Dr. Bunting observed the ulcers related by Slayton, supra, as early as December, 1973, the testimony of the doctors was essentially consistent, both medically and factually, with one noteworthy exception—Dr. Lynch testified that Slayton's employment with KRUX was a precipitating cause of Slayton's current skin problems.

Although Dr. Lynch attached the socalled magical words "to a reasonable medical probability or certainty", *Crawford v. Industrial Commission,* 23 Ariz.App. 578, 534 P.2d 1077 (1975); *State Compensation Fund v. Industrial Commission,* 24 Ariz.App. 31, 535 P.2d 623 (1975), it is clear from a review of all the medical and

lay testimony there is ample support for the hearing officer's finding that Slayton's disease and condition deteriorated without any cause being legally attributable to his working conditions.

We need not extensively set forth in this opinion the medical testimony. The dermatologists were clear that Slayton's condition was without a known cause or cure; that there would be periods of remission and exacerbation; that some treatments were effective and some were not. Excessive heat, cold, dryness, wetness—all affected the disease adversely. Although Slayton believed he no longer produced sweat, the doctors said that his sweat glands still functioned, but secreted the waste products directly under the skin, instead of outside, which caused additional irritation and trouble. As Dr. Liebsohn said:

> "In this type of condition, which we call exfoliative dermatitis, the sweat glands are malfunctioning, they are not properly functioning. When heat is applied to the body in any way whatsoever, the response for sweating occurs, because these sweat ductals are blocked to a large degree. The sweat must go somewhere, and we have made assumptions in this condition and other conditions of this kind that the sweat goes through the skin rather than over and outside the skin, which we would call sweating.
>
> "The sweat does carry multiple types of chemicals and metabolic wastes that the body produces, and these can obviously irritate skin when it reaches areas where it is not normally produced."

Although Dr. Liebsohn acknowledged he could not attribute Slayton's condition to his working conditions to the degree of certainty Dr. Lynch did, they obviously agreed that the exposure to heat and sun would always exacerbate the condition. We do not deem these differences significant, any more than we are willing to downgrade Dr. Lynch's testimony that he disregarded Slayton's history of no stress at KRUX in determining that Slayton was in fact under physiological stress because of his self-imposed long hours, at least for purposes of aggravating his skin condition. This is the doctor's prerogative in his area of expertise, and is analogous to Slayton's lay view that he no longer sweated or had sweat glands, which was not medically true.

Dr. Liebsohn, in answer to a question as to why Slayton's prognosis for recovery was very poor, points us to the ultimate legal resolution of this case:

> "A. Exfoliative dermatitis is an extremely serious ,disease. Whatever factors are present that can cause death in this condition, I would equate to a person that was burned with a large portion of his skin denuded, or removed or off, and I would feel that a person with exfoliative dermatitis is walking a very fine line, and sudden deaths have occurred in any number of cases, and I would say poor, and with an underlining, underlying it could happen today, tomorrow, or the next day."

Counsel waged their evidentiary battle essentially over whether Slayton's employment with KRUX, which lasted only 5 months, was more stressful or exposed Slayton to more of the elements than his 5-year employment with KRDS. What the record ends up showing conclusively is that Slayton's employment situation, in either case, was no different from that of every other outside salesman, who also has some inside duties, in the State of Arizona. While it took an extraordinary amount of personal courage and dedication for Slayton to continue to work under such circumstances, industry is not responsible for the result.

In *Crawford v. Industrial Commission,* supra, we held that the disease coccidioidomycosis (Valley Fever), absent some special exposure not common to the rest of the population, could not be industrially related, in spite of an eminent physician's testimony:

> " . . . *that again using the legal term with a reasonable medical certainty,*

I feel there is a direct correlation between Mr. Crawford's illness, Valley Fever, and his job occupation.'" *Crawford v. Industrial Commission*, supra, 23 Ariz.App. at 579, 534 P.2d at 1078 (emphasis the Court's).

In citing the decisions of *Treadway v. Industrial Commission*, 69 Ariz. 301, 213 P.2d 373 (1950) and *O'Connor v. Industrial Commission*, 19 Ariz.App. 43, 504 P.2d 966 (1972), the Court held that "there must be a clearly established facet of special exposure in excess of that of the 'commonalty'." *Crawford*, supra, 23 Ariz.App. at 583, 534 P.2d at 1082.

While *Crawford* dealt with the cause of a disease as opposed to an aggravation, or precipitation, such as we have here, this principle seems to carry forward when applied to cases of alleged aggravation of preexisting diseases or body conditions (see generally: back cases where a specific accident or incident is required, as opposed to work generally, in order to aggravate the preexisting congenital or chronic condition, e. g. *Schreven v. Industrial Commission*, 96 Ariz. 143, 393 P.2d 150 (1964); *Arellano v. Industrial Commission*, 25 Ariz.App. 598, 545 P.2d 446 (1976); *Price v. Industrial Commission*, 23 Ariz.App. 1, 529 P.2d 1210 (1975).

Three recent decisions of this Court emphasize this principle as it involves diseases. In *Montgomery Ward Co. v. Industrial Commission*, 14 Ariz.App. 21, 480 P.2d 358 (1971), this Court held that it was the natural progression of the underlying disease—rheumatoid arthritis—and not the work which caused the problem complained of. In disposing of a remarkably similar argument, Judge Haire's reasoning is instructive:

"On the other hand, while both Dr. Farness and Dr. Thompson testified that in their opinion Mrs. Fuller's work activities did aggravate her arthritis by increasing and prolonging the pain and swelling in her arthritic afflicted joints, there is no testimony from which it can be inferred that the work activity actu-ally caused a disability which would not have existed separate and apart from the work activities involved. The situation here where Mrs. Fuller's arthritic condition brought her to the position so that her *ordinary work activities* caused aggravating pain and swelling is not at all comparable to the fact situations involved in cases cited in support of her claim." 14 Ariz.App. at 23, 480 P.2d at 360. (Emphasis supplied)

Judge Haire then distinguished several cases, some of which are cited here by Slayton, on the basis that they involved specific industrially related accidents or injuries which aggravated the preexisting condition. *Paulley v. Industrial Commission*, 91 Ariz. 266, 371 P.2d 888 (1962); *Schreven v. Industrial Commission*, supra; *Murray v. Industrial Commission*, 87 Ariz. 190, 349 P.2d 627 (1960). See: *Harbor Insurance v. Industrial Commission*, supra, wherein rheumatoid arthritis caused by a specific work-related accident was held to be compensable.

In *Nelson v. Industrial Commission*, 24 Ariz.App. 94, 536 P.2d 215 (1975), this Court held that an award which found that the petitioner's Reynaud's Disease was not causally related to his employment was supported by the evidence. The cause of disease is unknown, but it is usually manifested in and aggravated more in people who use their hands a lot, such as the petitioner Nelson, a mechanic who had worked for twenty years with a variety of vibrating tools. Although a puncture wound originally caused Nelson to see a doctor, all agreed that this accident did not precipitate or aggravate the disease. Much like our situation here, the underlying condition was subject to periods of remission and exacerbation and was unquestionably aggravated by a variety of activities Nelson engaged in, including the use of tools at work. In spite of medical testimony almost as strong as here concerning the precipitation of the disease, the Court upheld the Industrial Commission's view that there was no causal con-

nection for purposes of workmen's compensation.

In affirming an award for a non-compensable claim, Judge Wren, writing for the Court in *Ayer v. Industrial Commission,* 23 Ariz.App. 163, 531 P.2d 208 (1975) reaffirmed our holding in *Shope v. Industrial Commission,* 17 Ariz.App. 23, 495 P.2d 148 (1972):

"A disabling mental condition brought about by the gradual buildup of emotional stress over a period of time, and not by an unexpected injury causing event, is not compensable unless accompanied by physical force or exertion. *Shope,* supra. The evidence here reveals no unexpected injury causing event but rather a buildup of emotional stress over a period of years. As stated in *Shope,* '. . . to grant petitioner [her] requested relief would literally open Pandora's Box permitting compensation to any disgruntled employee who leaves [her] job in a huff because of an emotional disturbance.'" 23 Ariz.App. at 166, 531 P.2d at 211.

If we were to hold as Slayton suggests, we envision not so much a Pandora's Box regarding compensation claims as an absolute bar to employment of people similarly afflicted. If a holding such as the one sought here by Slayton had been in effect in 1969 or 1974 when he was able to secure lucrative employment with KRDS and KRUX, he would have been unable to obtain the jobs, with that kind of a liability exposure, in spite of his demonstrated ability and his desire to support his family as long as he could possibly endure his disease. The statutes and decisions of this State do not permit such a result.

The award is affirmed.

HAIRE, C. J., and EUBANK, P. J., concur.