362 A.2d 139.

CHARLES L. JONES *vs.* GRINNELL CORP.

AUGUST 13, 1976.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is an employee's appeal from the denial by the Workmen's Compensation Commission of a petition for disfigurement benefits. The record indicates that on December 23, 1969, Jones suffered severe work-related third-degree burns to his right forearm. He was admitted to Rhode Island Hospital where an attempt was made to save the arm. Within a week of the mishap Grinnell executed a preliminary agreement in which it agreed to pay Jones a weekly sum of $70 so long as he remained incapacitated, dependency benefits for his six children, and the medical expense payments called for by the Workmen's Compensation Act. A few days later, January 2, 1970, Jones's right arm was amputated just above the elbow.

After the amputation, Jones was given physical therapy treatment and fitted with a prosthesis. His rehabilitation program ran into difficulty because he continued to experience pain in the stump area. On January 11, 1971, he returned to the hospital for the excision of a neuroma, a condition which his surgeon defined as a "growth of nerve tissue * * * embedded in [the] scar tissue at the amputation site." In October of 1971 Grinnell executed a second agreement in which it agreed to pay Jones specific compensation for the severance of his right arm. This agreement called for the weekly payment of $45, which was to be paid to Jones for a period of 312 weeks.

Jones's attempts to master his prosthetic device were impeded by continual pain in the stump area, and in November 1973 he paid a fourth visit to the operating table to have another neuroma excised. In January 1974 Jones was still complaining of pain in the stump, but there were no objective signs of a recurring neuroma.

Jones filed this disfigurement petition on February 1, 1974. A hearing was held before a trial commissioner, who denied the petition. An appeal followed to the full commission, where a decree was entered affirming the trial commissioner's finding of fact and law. The commission's denial is based upon its finding that Jones's petition was barred by the applicable statute of limitations.

The statute of limitations governing workmen's compensation proceedings is set forth in G. L. 1956 (1968 Reenactment) §28-35-57. In essence, the relevant portions of this statute provide that a compensation claim will be barred unless an agreement to pay compensation or a petition seeking compensation[1] is filed with the appropriate author-

---

[1] An agreement to pay compensation benefits is filed with the Director of Labor, and when it receives the director's approval, the agreement has the same force and effect as a decree of the Workmen's Compensation Commission. Sections 28-35-1 and 28-35-3. Petitions for adjudication of disputed matters are filed with the commission. Section 28-35-12.

ity within 2 years after an occurrence or manifestation of the incapacity; and where there is an undisclosed physical or mental impairment, the time of the filing of the claim will not begin to run until the time the claimant either knew or should have known of the existence of the impairment and its causal relationship to his employment or when he becomes disabled, whichever event comes later.

Before proceeding with the merits of this controversy, a brief preliminary reference to certain legal principles is warranted. In *Andreozzi* v. *D'Antuono*, 113 R. I. 155, 159, 319 A.2d 16, 18 (1974), we pointed out that the word "compensation," when employed in our Workmen's Compensation Act, encompasses a wide variety of benefits. It includes payments for the loss of earning capacity, a limb, hearing, or sight; support of dependents; disfigurement; and the payment of medical and funeral expenses. Again, in *Fontaine* v. *Gorfine*, 105 R. I. 174, 181-82, 250 A.2d 361, 364-65 (1969), we alluded to the fact that the word "injury" does not have the same meaning whenever it appears in the Act. Sometimes, we said, it means an incapacity for work, but when used in relation to the payment of specific compensation, it refers to a type of condition which may not necessarily result in the loss of earning capacity but which will establish the worker's right to receive a weekly benefit payment for any of the specific losses enumerated in §28-33-19. Such payments, we have said, are to be considered as "damages" for the injury or loss sustained rather than "compensation." *Coletta* v. *State*, 106 R. I. 764, 771, 263 A.2d 681, 685 (1970); *Sherry* v. *Crescent Co.*, 101 R. I. 703, 706, 226 A.2d 819, 821 (1967); *Steele* v. *Darlington Fabrics Corp.*, 78 R. I. 272, 275, 81 A.2d 424, 426 (1951).

In 1963 the General Assembly amended the specific compensation benefits of the Act so as to provide a weekly benefit to a worker whose injury has resulted in perma-

nent disfigurement. Section 28-33-19(n)(2) specified that a permanent disfigurement about the face, head, neck, hand, or arm entitled the injured employee to a weekly benefit payable for a maximum period of 300 weeks. The amount of the benefit depended upon the employee's average weekly wage, but in no way could the payment be more than $30 or less than $16.[2] The number of weeks the payment would be made was left to the sound discretion of the commission with the maximum number of weeks being 300. The statute called for a compensation award that is "proper and equitable." In 1966 we established the rule that the time for filing a claim for specific compensation benefits, where there has been a protracted effort to restore the use of a bodily function, runs from the date when sound medical opinion determines that an end result has been reached in the treatment phase and nothing further can be done to help the employee because the then existing condition has become permanent. *Tirocchi* v. *United States Rubber Co.*, 101 R. I. 429, 434, 224 A.2d 387, 391 (1966).

This court defined "disfigurement" as "* * * 'that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner.' " *St. Laurent* v. *Kaiser Aluminum & Chem. Corp.*, 113 R. I. 10, 13, 316 A.2d 504, 506 (1974). After defining "disfigurement," we emphasized that the Legislature, in providing compensation for disfigurement, never intended to penalize the employer but that the commission, after determining the existence and extent of the disfigurement on the basis of all relevant material evidence submitted by the parties,

---

[2] The Legislature at its January 1969 session increased the maximum benefit payment to $45 and the minimum to $30. Public Laws 1969, ch. 144, §1. Later, in 1972, the General Assembly provided compensation for disfigurement of a leg. Public Laws 1972, ch. 213.

could make an award that is proper and equitable in the given circumstances. *Id.* at 13-14, 316 A.2d at 506.

Turning to the present controversy, two witnesses appeared before the trial commissioner. Jones's testimony at a March 20, 1974, hearing was informataive, but his surgeon's (Dr. Kenneth E. Liffman) testimony before the trial commissioner almost a month later was crucial. Doctor Liffman described the amputation and the removal of the two neuromas. Each removal involved the opening of the stump and the excision of a nerve end that was embedded in the scar tissue. Once the nerve end was removed, the skin was sutured, and the healing process took over. Doctor Liffman reported that during each of the removal procedures he removed about an inch of tissue. He also told the trial commissioner that he had examined his patient 4 days earlier, on April 15, 1974, and that there was no longer any obstacle to his ability "to adjust and wear a prosthesis."

After Dr. Liffman had described the removal of the tissue and the suturing, he was asked by Jones's counsel: "* * * when this wound heals, does it have the same or different appearance as immediately prior to the surgery?" The witness answered: "Same appearance." When counsel asked if the appearance remained the same in all cases or whether one had to wait for the end result, Dr. Liffman responded: "You see * * * the physical appearance really is unaltered." At this point in the hearing the trial commissioner explained to the witness the definition of disfigurement to which we have previously alluded in this opinion, and, after noting that it was obvious that Jones's stump came within that definition, he asked the medical expert: "Now using that definition, did these two operations on the neuromas, change the disfigurement at all as far as the appearance is concerned since the time of his first amputation?" The witness re-

plied: "No, it has not." There was no cross-examination by Grinnell's counsel, and the hearing was, therefore, terminated.

In its decision the commission relied on Dr. Liffman's negative response to the trial commissioner's inquiry and concluded that since medical evidence indicated that the end result as to Jones's disfigurement had been reached at a time prior to January 11, 1971, the date of the first excision, Jones's February 1974 petition was far beyond the 2-year statute of limitations.

We believe that the commission erred in its application of the *Tirocchi* rule to the case at bar. Although we do not depart from the "sound medical opinion end-result" rationale which *Tirocchi* espouses, there is a difference between the loss suffered by *Tirocchi* and other workers similarly situated and the loss suffered by Jones. In *Tirocchi* the issue was at what point in time would sound medical opinion say that the functional use of the worker's hands had reached its maximum potential. There we were concerned with the loss of a bodily function, and the employee's surgeon did testify that after an extended period of treatment he had concluded that there was nothing further he could do to help his patient. In Jones's case we are concerned with the loss of image rather than a loss of use, and at no time did Dr. Liffman ever indicate that he had reached a dead end in the treatment of his patient. The medical profession and its skilled allies in their treatment of patients in "disfigurement" and "loss of use" cases are seeking to attain two different goals. In loss of use cases, medical personnel embark in an all-out effort to "maximize" the patient's use of the damaged limb or organ, whereas physicians in disfigurement cases are attempting, through cosmetic surgery and artificial devices, to "minimize" for the patient

and others the visual impact from observing his otherwise unsightly appearance.

The record indicates that from the time of the January 1970 amputation up until April 1974, Dr. Liffman and the technicians at the Rhode Island Hospital Division of Physical Therapy were continuing to expend every effort to rehabilitate the worker. Rehabilitation is the restoration of an individual to his greatest potential — physically, mentally, socially, and vocationally. Cull and Hardy, *Vocational Rehabilitation: Profession and Process* at 5 (1972 ed.) Jones's mental and social rehabilitation was still under way during the 2 years that preceded the filing of this disfigurement petition. In a society where the majority of people take great pains to preserve their appearance, Jones's body image suffered a tremendous blow. Although Dr. Liffman did report that the stump looked as good or as bad (depending on one's point of view) at the completion of the two excisions as it did shortly after the amputation, he and his associates continued to work at improving Jones's image by minimizing the visual impact of the disfigurement for the patient and those who looked at him. Certainly, an artificial arm can serve to fill what would have been an empty or pinned-up sleeve. Some of Jones's observable impairment may be concealed by his use of a prosthetic device. While Jones will be aware of his disfigurement, the fact that his image, or a portion thereof, has been restored could work psychological wonders for him.

In *St. Laurent* the disfigurement involved the loss of an eye, and we ruled that the statutory mandate for a "proper and equitable" award was satisfied when the worker was viewed with and without his artificial eye. We have no doubt that had Jones filed his disfigurement petition once the amputation site had first healed, Grinnell could have charged, quite properly, that the commission, in order to

adhere to the "proper and equitable" standard, should defer action until the employee could be viewed, like St. Laurent, "with" and "without" his prosthesis. It is obvious that from a psychological or cosmetical point of view Dr. Liffman had not reached an end result in the total treatment of his patient until the spring of 1974. Accordingly, we find as a matter of law that Jones's present petition was timely filed.

The employee's appeal is sustained, the decree appealed from is vacated, and the cause is remanded to the Workmen's Compensation Commission for further proceedings.

*Abedon, Stanzler, Biener, Skolnik & Lipsey, Richard A. Skolnik,* for petitioner; *Lovett & Linder, Ltd., Raul L. Lovett, amicus curiae,* for petitioner.

*Charles H. Anderson,* for respondent.