**Beulah SEITZ**

v.

**L & R INDUSTRIES, INC. (PALCO PRODUCTS DIVISION).**

No. 79–61–Appeal.

Supreme Court of Rhode Island.

Dec. 4, 1981.

Lovett & Linder, Ltd., Raul L. Lovett, Lauren E. Jones, Providence, for petitioner.

Gunning, LaFazia & Gnys, Inc., Raymond LaFazia, Guy J. Wells, Tillinghast, Collins & Graham, DeWitte T. Kersh, Peter J. McGinn, Christopher H. Little, Providence, for New England Tel. and Tel. Co., amicus curiae.

Hinckley, Allen, Salisbury & Parsons, Robert W. Lovegreen, David W. Zizik, Providence, for Hospital Ass'n of Rhode Island, amicus curiae.

OPINION

WEISBERGER, Justice.

This is an appeal from a final decree of the appellate commission awarding compensation to Beulah Seitz (employee) for total disability resulting from a personal injury of a psychological nature allegedly arising out of the course of her employment during a period of approximately sixteen working days beginning September 15, 1975, and ending on October 3, 1975. The case was initially argued before four members of the

court on March 4, 1981. This argument resulted in a per curiam opinion in which the final decree of the appellate commission was affirmed by an equally divided court. *Seitz v. L & R Industries, Inc.*, R.I., 428 A.2d 788 (1981). Thereafter, a petition for reargument was granted, and the case was reargued before a five-member court on October 5, 1981. The posture in which this case comes before us presents legal and factual issues of first impression in this state. The facts as found by the appellate commission are as follows.

The employee had worked as secretary to the vice president and general manager of the Worcester Pressed Aluminum Corporation (Worcester) for approximately six years. The place of employment during this period was Worcester, Massachusetts. In 1975 portions of the Worcester enterprise were placed on the market for sale. One of the divisions known as Palco Products Division was sold to L & R Industries, Inc. (employer). At some time during the month of September 1975, the employer ordered the Palco operations to be moved from Worcester, Massachusetts, to Smithfield, Rhode Island. This change necessitated physical movement of office equipment, furniture, inventory, records, invoices, and machinery. The moving operation began on a Friday afternoon and was completed in a thirty-six-hour period. The employee and a former vice president of Palco Products Division, one Francis Maguire, were active in supervising and implementing the moving activities.

When Palco Products, under the new ownership, began operation on the following Monday, conditions in the new location were confusing and abnormal to a marked degree. Records were unavailable, the telephone service was inadequate, the previous tenants had not vacated the premises, and personnel were untrained. The employee sought to perform duties as office manager and secretary to Mr. Maguire but was also required to do janitorial and cleaning work and to protect office equipment from potential damage due to a leaking roof. She encountered difficulties in interpersonal relations with other employees in the new location. Her authority as office manager was not recognized, and office protocol was not satisfactory to her. She attempted to arrange a meeting with Mr. Maguire and other key personnel in order to work out these difficulties and to improve the organization of the employer's business at the new location. The meeting was scheduled for October 3, 1975, but because of the intervention of another employee, the meeting did not take place. As a result, the employee became so upset that she terminated her employment on the afternoon of October 3, 1975, and has not returned to work since that time.

Dr. Elliot R. Reiner, a psychiatrist who practices in the city of Worcester, had earlier begun treatment of the employee on June 10, 1967, for a condition he described as a depressive neurosis. After three office visits, the employee was discharged. The employee next visited the doctor on October 9, 1975, and described the emotional disruption she had experienced in association with occupational problems and conflicts during the period she had worked with the employer in Smithfield. The doctor diagnosed the employee's condition as an "obsessive compulsive personality disorder." The doctor stated, and the commission found, that the employee's rigid personality characteristic had been of long standing but had been aggravated by her employment from September 15, 1975 to October 3, 1975. The doctor testified that the employee had sustained an emotional trauma but had not experienced any physical trauma as the result of her employment.

The commission found that this aggravation qualified within the terms of G.L. 1956 (1979 Reenactment) § 28–33–1 as a "personal injury arising out of and in the course of [her] employment." Although the commission determined the aggravation to be entirely psychic, it found as a matter of fact and held as a matter of law that the conditions under which the employee had been required to work resulted in a malfunction of the body which gave rise to an incapacity to perform her customary work. Therefore, the appellate commission, with one dissenting member, sustained the decree of

the trial commissioner and ordered that compensation for total disability be paid to the employee. We reverse.

Professor Larson in his treatise on *The Law of Workmen's Compensation* has set forth an analysis of three broad types of psychic injury.[1] The first type is a physical injury caused by mental stimulus. An analysis of case law on this subject leads Professor Larson to conclude that the "decisions uniformly find compensability."[2] There appears to have been only one case reported to the *contra* in the last twenty-five years, *Toth v. Standard Oil Co.*, 160 Ohio St. 1, 113 N.E.2d 81 (1953). In that case the Supreme Court of Ohio determined that an injury must be physical or there must be a traumatic damage of an accidental character. Professor Larson criticizes this opinion as unnecessary under the Ohio statute and as *contra* to the great weight of authority.[3] Rhode Island has no reported cases in respect to such injuries.

The second broad type of psychic injury is that caused by physical trauma. The courts, including this court, have almost universally awarded compensation for this type of physically produced psychic injury upon an appropriate showing of causal connection. *Greenville Finishing Co. v. Pezza*, 81 R.I. 20, 98 A.2d 825 (1953) (neurosis produced by traumatic loss of eye); *Imperial Knife Co. v. Calise*, 80 R.I. 428, 97 A.2d 579 (1953) (incapacity from a fear complex following severe and painful fractures of fingers while operating a power press); *Wareham v. United States Rubber Co.*, 73 R.I. 207, 54 A.2d 372 (1947) (anxiety neurosis following back injury). *See also* cases cited from numerous jurisdictions under § 42.22, 1B Larson, *The Law of Workmen's Compensation* (1980).

The third type of psychiatric injury mentioned by Professor Larson is a mental injury produced by mental stimulus in which there are neither physical causes nor physical results. Professor Larson finds "a distinct majority position supporting compensability in these cases" but concedes that "[t]he *contra* view, denying compensation in the 'mental-mental' category continues, however, to command a substantial following." *Id.* § 42.23 at 7–628.[4] In this field, of course, it is difficult to compare holdings in

1. 1B Larson, *The Law of Workmen's Compensation* §§ 42.21—.23 (1980).

2. 1B Larson, *supra* at § 42.21.

3. *See, e.g., Hoage v. Royal Indem. Co.*, 90 F.2d 387 (D.C.Cir.), *cert. denied*, 302 U.S. 736, 58 S.Ct. 122, 82 L.Ed. 569 (1937); *Lamb v. Workmen's Compensation Appeals Bd.*, 11 Cal.3d 274, 520 P.2d 978, 113 Cal.Rptr. 162 (1974); *Firemen's Fund Indem. Co. v. Indus. Accident Comm'n*, 241 P.2d 299 (Cal.Dist.Ct.App.), *aff'd*, 39 Cal.2d 831, 250 P.2d 148 (1952); *Tracy v. Americana Hotel*, 234 So.2d 641 (Fla.1970); *J. Norman Geipe, Inc. v. Collett*, 172 Md. 165, 190 A. 836 (1937); *Weiner's Case*, 345 Mass. 761, 186 N.E.2d 603 (1962); *Egan's Case*, 331 Mass. 11, 116 N.E.2d 844 (1954); *Klimas v. Trans Caribbean Airways, Inc.*, 10 N.Y.2d 209, 176 N.E.2d 714, 219 N.Y.S.2d 14 (1961).

4. *See, e.g., Verdugo v. Indus. Comm'n*, 114 Ariz. 477, 561 P.2d 1249 (1977) (mill foreman denied benefits for psychiatric disability brought about by emotional distress from the ordinary and expected incidents of his employment); *Ayer v. Indus. Comm'n*, 23 Ariz.App. 163, 531 P.2d 208 (1975) (switchboard operator denied compensation for mental disorders allegedly resulting from a gradual buildup of emotional stress over a period of time); *Shope*

*v. Indus. Comm'n*, 17 Ariz.App. 23, 495 P.2d 148 (1972) (compensation denied for psychoneurotic anxiety produced by emotional stress over a period of years); *Erhart v. Great Western Sugar Co.*, 169 Mont. 375, 546 P.2d 1055 (1976) (compensation denied where claimant's disability was produced by long working hours and job pressures); *Vernon v. Seven-Eleven Stores*, 547 P.2d 1300 (Okl.1976) (store manager denied compensation where emotional disorders resulted from being required to undergo intermittent polygraph tests and automatic termination of employment because he failed the last test, the court expressly rejected the "mental-mental" category of liability). Decisions approving or requiring "mental-mental" awards include *State Compensation Fund v. Indus. Comm'n*, 24 Ariz.App. 31, 535 P.2d 623 (1975); *Brock v. Indus. Comm'n*, 15 Ariz.App. 95, 486 P.2d 207 (1971); *Baker v. Workmen's Compensation Appeals Bd.*, 18 Cal.App.3d 852, 96 Cal.Rptr. 279 (1971); *Carter v. General Motors Corp.*, 361 Mich. 577, 106 N.W.2d 105 (1960); *Rainko v. Webster-Eisenlohr, Inc.*, 306 Mich. 328, 10 N.W.2d 903 (1943); *Todd v. Goostree*, 493 S.W.2d 411 (Mo.Ct.App.1973); *Wolfe v. Sibley, Lindsay & Curr Co.*, 36 N.Y.2d 505, 330 N.E.2d 603, 369 N.Y.S.2d 637 (1975); *Bailey v. American General Ins. Co.*, 154 Tex. 430, 279 S.W.2d 315 (1955); *Burlington Mills*

various jurisdictions because of the variation among the statutory provisions. Some statutes require accidental injuries. Other statutes, such as that of Rhode Island, require "personal injury" without the necessity of an accident.

A number of the states that have approved compensation for psychic injuries produced by mental stimulus have done so on the basis of dramatic psychological trauma. For example, in *Bailey v. American General Insurance Co.*, 154 Tex. 430, 279 S.W.2d 315 (1955), characterized by Professor Larson as "[o]ne of the most impressive of the earlier decisions," the claimant and another workman were on a scaffold when one end gave way. The other workman plunged to his death in view of the claimant. The claimant thought he was about to be killed but was caught in a cable and did not fall. He managed to jump to the roof of another building. After this experience, the claimant was unable to continue in this employment as a structural steelworker. He would blank out and freeze, undergoing complete paralysis when attempting work in a high place. On these facts the Supreme Court of Texas reversed the Court of Civil Appeals and determined that the psychic injury was compensable.

In *Wolfe v. Sibley, Lindsay & Curr Co.*, 36 N.Y.2d 505, 330 N.E.2d 603, 369 N.Y.S.2d 637 (1975), after many years of rejecting the compensability of "mental-mental" injuries, the Court of Appeals of New York ordered the award of compensation based upon a dramatic set of facts. The employee had served as secretary to the security director of a department store. By reason of job pressures, the security director became increasingly nervous and withdrawn. The female employee sought to assist her boss by relieving him of some of the duties of his position and by serving as a confidante. However, one day she entered the office and found the security director dead of a self-inflicted gunshot wound. The shock of this encounter caused the employee to enter into a condition of severe depression which left her unable to work for about a year. In awarding compensation, the court noted,

"There is nothing talismanic about physical impact * * *." *Id.* at 510, 330 N.E.2d at 606, 369 N.Y.S.2d at 642. In spite of the drama of this occurrence, Chief Judge Breitel in dissent made the following observation:

"In an era marked by examples of overburdening of socially desirable programs with resultant curtailment or destruction of such programs, a realistic assessment of impact of doctrine is imperative. An overburdening of the compensation system by injudicious and open-ended expansion of compensation benefits, especially for costly, prolonged, and often only ameliorative psychiatric care, cannot but threaten its soundness or that of the enterprises upon which it depends." *Id.* at 513–14, 330 N.E.2d at 608, 369 N.Y.S.2d at 644.

A third illustrative state in which this category of injury has been found compensable is Illinois. In *Pathfinder Co. v. Industrial Commission*, 62 Ill.2d 556, 343 N.E.2d 913 (1976), an employee who was engaged in instructing a fellow worker in the operation of a punch press saw her coworker's hand being caught in the press. When the employee sought to extricate her coworker's hand, she found it already severed at the wrist. The employee fainted and was taken to the hospital. Upon return to work, she suffered from psychic and neurotic symptoms which disabled her from employment. The Supreme Court of Illinois, in ordering compensation, expressed the opinion that its holding would not encourage filing of claims by malingering employees but suggested that the Illinois Industrial Commission should continue to be "vigilant in the assessment of claims that might be easily fabricated or exaggerated." *Id.* at 567, 343 N.E.2d at 919.

As an example of a contrary conclusion, one might consider the case of *Ayer v. Industrial Commission*, 23 Ariz.App. 163, 531 P.2d 208 (1975), in which a switchboard operator was denied compensation for mental problems that she claimed to be the result of the increase in the duties of her employment and a consequent buildup of

*Corp. v. Hagood*, 177 Va. 204, 13 S.E.2d 291 (1941).

emotional stress over a period of time. The court determined that this kind of disabling mental condition—one not caused by an unexpected traumatic event—was not compensable. The court suggested that to determine otherwise would literally be to open Pandora's Box by " 'permitting compensation to any disgruntled employee who leaves [her] job in a huff because of an emotional disturbance.' " *Id.* at 166, 531 P.2d at 211.

The Supreme Court of Wisconsin has succinctly encapsulated the distinction in *School District No. 1 v. Department of Industry, Labor & Human Relations,* 62 Wis.2d 370, 215 N.W.2d 373 (1974), in which it stated:

> "Thus it is the opinion of this court that mental injury nontraumatically caused must have resulted from a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience. Only if the 'fortuitous event unexpected and unforeseen' can be said to be so out of the ordinary from the countless emotional strains and differences that employees encounter daily without serious mental injury will liability * * * be found." *Id.* at 377–78, 215 N.W.2d at 377.

In *School District No. 1,* compensation was denied to a school guidance teacher who suffered psychic injury in the form of an acute anxiety reaction upon seeing a recommendation from a group of students that she be dismissed from her position as a member of the guidance counseling staff of the school.

Our neighboring state of Massachusetts in *Fitzgibbons' Case,* 374 Mass. 633, 373 N.E.2d 1174 (1978) allowed compensation to a supervisory corrections officer who had reacted to a violent scuffle that brought about the death of a subordinate officer. This incident gave rise to an acute anxiety reaction on the part of Fitzgibbons which ultimately led to his committing suicide. The Supreme Judicial Court noted that this injury stemmed from a single traumatic event and not from response to everyday-employment stress. Thereafter, in *Albanese's Case,* 378 Mass. 14, 389 N.E.2d 83 (1979), the Supreme Judicial Court awarded compensation to a foreman who had reacted to conflicting orders from his immediate superior over a considerable period to the point where he was thoroughly discredited and confused. He had ultimately experienced such stress in attempting to accommodate the conflicting demands of both his subordinates and the plant manager that he became totally unable to perform his duties. The court held that this was a personal injury arising out of and in the course of employment. The court noted, however, that Albanese's injury was not "the result of everyday stress or '[b]odily wear and tear resulting from a long period of hard work.' " *Id.* at ——, 389 N.E.2d at 86.

Although it might be possible to multiply examples of cases in which compensation has been allowed as well as cases in which compensation has been withheld, there seems to be an elusive thread of consistency woven among them which may be discerned.

The courts are reluctant to deny compensation for genuine disability arising out of psychic injury. However, since screening of such claims is a difficult process, the courts recognize the burden that may be placed upon commerce and industry by allowing compensation for neurotic reaction to the ordinary everyday stresses that are found in most areas of employment. Indeed, it is a rare situation in which some adverse interpersonal relations among employees are not encountered from time to time. Employers and managers must admonish their subordinates and correct perceived shortcomings. The stress of competitive enterprise is ever present and attendant upon all types of commercial and industrial activity.

Great care must be taken in order to avoid the creation of voluntary "retirement" programs that may be seized upon by an employee at an early age if he or she is willing or, indeed, even eager to give up active employment and assert a neurotic inability to continue.

It is all very well to say that the adversary system will expose the difference between the genuine neurotic and the malingerer. We have great fears that neither

the science of psychiatry [5] nor the adversary judicial process is equal to this task on the type of claim here presented. An examination of the evidence in the instant case

5. Although psychiatrists are able to describe the symptomatology of obsessive-compulsive neurosis, the amount of hard factual information is extremely limited. Doctor Isaac Marks in a monograph prepared for the Institute of Psychiatry Maudsley Monographs series has stated:

"Despite the wealth of description of the clinical manifestations, remarkably little is known of the genesis of obsessive-compulsive symptoms, though there have been many speculations about the underlying mechanisms." I. Marks, *Patterns of Meanings in Psychiatric Patients* 5 (Institute of Psychiatry Maudsley Monograph No. 13, 1965).

More recently Melvin Gray, M.D., professor of psychiatry at the Chicago College of Osteopathic Medicine, has similarly noted:

"Due to the rarity of the disease—0.05%–1.0% in the general population and 1–2% in psychiatric practice—and lack of controlled studies, very little systematic knowledge is available. * * * Evidence indicates that patients with this least common neurotic entity are often of above average intelligence, frequently exceptionally talented, and prone to abstract thinking. Finally, the age of onset, on average, is in the early twenties and these patients are frequently first born or only children." (Footnote omitted.) M. Gray, *Neuroses* 156 (1978).

6. The psychiatric evaluation in this case was characterized by attention to subjective symptoms and a type of analysis which could be termed essentially tautological. Excerpts from the doctor's testimony on cross-examination are illustrative of this quality:

"Q Now the emotional effect of it, you say, was persisting but the cause of it had been removed.
"A Not in psychological terms, no.
"Q How did you attempt to remove this in psychological terms, Doctor?
"A Through exploiting situations in relation to the present illness, relating this to patterns of life in which figures in the office take on some of the emotional attributes in appearance, preconscious and unconscious minds and they react in a pattern as learned earlier and applied them to reality situations of the present so that there is a kind of similarity of responsiveness that persists. These are considered to be conflictual ones. They cause the problems that Mrs. Seitz reported and these then are traced and developed with more understanding to her.
"Q Where did you trace them to, Doctor?

discloses that the employee's psychiatrist largely accepted her statement that she was unable to return to work. [6] The patient, who had exhibited neurotic tendencies, aris-

"A To—into her family life, her child life, her adjustments in the present. It may go back one year, may go back five, it may go back in adolescence, may go back into early childhood, relationships with her mother, relationships with her father and brother, sisters.
"Q And those relationships gave you a particular type of individual, is that correct, Doctor?
"A Yes.
"Q And what you are telling us here is that at her employment because of those relationships, her emotions were aggravated, is that correct?
"A Yes. In other words, her life experience subjected her and I think produced in her kind of emotional fragility.
"Q An emotional fragility. And that emotional fragility was caused by the relationships with her husband, with her mother, her father and other members of her family?
"A I don't know about the husband, but I would say—I would say not with him but with the members of her old family, her childhood family.
"Q And if you had given her insight into her relationship with the members of her old family, she would have been able to quit treating with you, isn't that fair to state, Doctor?
"A Yes. If—if that insight were achieved and that she was able to utilize it and apply it, yes, that's the goal of treatment but her—her character problem is one that is notable for its rigidity and persistence.
"Q And that rigidity and persistence were formulated in her childhood?
"A Yes.
"Q And you have never been able to give her insight which would break down that rigidity?
"A I feel that she's made and I think that she feels she's made some progress.
"Q In that regard?
"A Yes.
"Q And if you had obtained more success, she wouldn't have had this compulsive-obstructiveness that you described?
"A I wouldn't be able to answer that question. I don't—the answer would—is not known.
"Q All right. But it is your opinion as I understand it, that this type of compulsive obstructive—this compulsive what?
"A Obsessive compulsive.
"Q Obsessive compulsiveness get deep rooted?

ing out of family relationships as early as 1967, apparently suffered an aggravation during her sixteen-day period of employment with the employer. An analysis of the testimony in the case would clearly indicate that this stressful period contained conditions that, though scarcely tranquil did not exceed the intensity of stimuli encountered by thousands of other employees and

> "A Yes.
> "Q And you as a psychiatrist, can only have limited success in treating it insofar as Mrs. Seitz is concerned?
> "A Well, in sixty-nine sessions and probably sixty, that would include that, this would be quite an accomplishment, yes, to achieve that kind of success."

Transcript at 245–48.

> "* * *
> "Q So that the basis of your opinion of her inability to work is because of her expressions of fear of the assignment?
> "A Yes. And being able to cope in other words.
> "Q So it's really her opinion as to whether or not she can work and not yours that you are giving us, isn't that so, Doctor?
> "A It is my—it is my opinion that, that she is not able to work. I would have told her so if I thought that she was able to.
> "Q And the basis for your opinion is that she says she's afraid to go to work?
> "A Yes.
> "Q Is that right?
> "A Yes.
> "Q Why is she afraid to go to work, Doctor?
> "A A fear of being able to handle the stresses of the job that she might find.
> "Q Has any of your psychotherapy been directed toward alleviating these stresses?
> "A Yes. All have—they have—all have been, yeah.
> "Q But it's her statement to you that she is afraid to go to work, that is the basis of your opinion that she is unable to work?
> "A No, not at all.
> "Q What is the basis of your opinion that she is not able to work, Doctor?
> "A The evidence of the character adjustment here, her fear of being able to contain herself, of being able to express herself, to find other alternatives for the tension that builds up and can be so destructive to her adjustment.
> "Q And the only way she is going to find out whether she can cope with it or not is to try it, isn't that so, Doctor?
> "A No. I think that—I hope that she could accept an attitude of confidence.
> "Q Has she ever accepted that attitude of confidence since she's been under your care since 1975, Doctor?

management personnel every day. If psychic injury is to be compensable, a more dramatically stressful stimulus must be established. Otherwise, the fears expressed by Chief Judge Breitel dissenting in *Wolfe v. Sibley, Lindsay & Curr Co., supra,* would be most applicable in terms of the potential burdens to be imposed upon the Rhode Island compensation system.[7]

> "A No, she has not."

Transcript at 256–57.

The foregoing analysis makes it very difficult to perceive a scientific empiricism at work. The lack of any objective standards leaves little choice to the psychiatrist except to give complete credence to the patient's statement of her own disability.

7. Our brother Kelleher argues eloquently in dissent that principles of statutory interpretation mandate that compensation be awarded to an employee who receives a personal injury produced by a mental stimulus related to situations arising out of job stress. He further suggests that any relief from such statutory interpretation should be sought from the Legislature rather than from this court. It is worthy of note that the term "personal injury," as opposed to "person injury sustained by accident," was first introduced into our workers' compensation statute by provisions of P.L. 1949, ch. 2282. At the time of enactment of this statute, not a single case can be found which awarded compensation for mental injuries or aggravation produced by gradually accumulated job stress. An examination of the cases compiled in 97 A.L.R.3d 161, 184 (1980), allowing compensation for mental disorder resulting from nonsudden stimulus, discloses that the earliest case set forth in the compilation appears to be *Carter v. General Motors Corp.,* 361 Mich. 577, 106 N.W.2d 105 (1960). An examination of the cases set forth under § 42.23(b) of 1B Larson, *The Law of Workmen's Compensation,* fails also to disclose any case awarding compensation for gradual stimulus causing nervous injury prior to 1960. As a consequence, the decisional context in which our Legislature adopted the statutory term "personal injury" did not include any interpretation that would have alerted the Legislature to the ramifications of compensation for mental injury caused by gradual, nondramatic stimulus. We should, therefore, suggest that in the event the Legislature desired to make such injuries compensable, a more definite expression of intention than the words "personal injury" should be manifested. Consequently, although we agree that any change in the statute should be made at the State House rather than in the court house, we are of the opinion that interpretation

 Although this court is bound by the findings of fact made by the commission, in instances in which the facts as found lead only to one permissible conclusion, then the resolution of a mixed question of law and fact will be treated as a question of law. *DeNardo v. Fairmount Foundries Cranston, Inc.*, R.I., 399 A.2d 1229 (1979).[8] In this case the question of whether the circumstances found to exist by the commission appropriately gave rise to the conclusion that the employee suffered a "personal injury" under the terms of § 28–33–1 constitutes a mixed question of law and fact. We hold that on the facts as found by the commission, to conclude that a personal injury had been established was impermissible. Therefore, the decree of the commission awarding compensation was erroneous as a matter of law.

For the reasons stated, the appeal of the employer is sustained, the decree appealed from is reversed, and the case is remanded to the Workers' Compensation Commission for entry of a decree consistent with this opinion.

KELLEHER, Justice, with whom BEVI-LACQUA, Chief Justice, joins, dissenting.

Although my brother Weisberger has addressed the issue presented by the litigants in his usual scholarly fashion, I cannot subscribe to his rejection of Beulah's petition because the rejection apparently overlooks the purposes of workers' compensation, ignores past legislative actions as well as judicial pronouncements, and is motivated by an opening-the-floodgates fear that, in my opinion, is groundless.

An overriding objective of workers' compensation legislation is to impose upon the employer the burden of caring for the casualties occurring in its employment by preventing an employee who has suffered a job-related loss of earning capacity from becoming a public charge. *Orthopedic Specialists, Inc. v. Great Atlantic & Pacific Tea Co.*, R.I., 388 A.2d 352 (1978); *Guilmette v. Humble Oil & Refining Co.*, 114 R.I. 508, 336 A.2d 553 (1975); *Nardolillo v. Big G Supermarket, Inc.*, 111 R.I. 751, 306 A.2d 844 (1973). Up until today, this court has consistently construed the provisions of the Workers' Compensation Act liberally so as to effectuate the legislation's humanitarian goals.

Rhode Island is one of a handful of jurisdictions[9] whose compensation statutes do not require that a worker's injury occur by accident. At its January 1949 session, the General Assembly, with its enactment of P.L. 1949, ch. 2282, removed the necessity of proof of an accidental injury. This change occurred after several individuals who had received on-the-job back injuries were denied compensation benefits because of their inability to show that the injury arose because of some "untoward event" or "unusual or extraordinary conditions." *See, e.g., Morel v. E. Turgeon Construction Co.*, 76 R.I. 25, 68 A.2d 23 (1949); *Parente v. Apponaug Co.*, 73 R.I. 441, 57 A.2d 168 (1948); and *Spolidoro v. United States Rubber Co.*, 72 R.I. 269, 50 A.2d 773 (1946).

Rhode Island's compensation act does not distinguish between a physical injury and a mental injury. In the past, we have stressed that even though the term "injury" does not have the same meaning whenever

of the words "personal injury" should be made in the legal context in which these words were first adopted rather than to confer upon them a judicial gloss from certain other selected jurisdictions applied long after the Legislature had initially spoken.

8. In that case we held that upon review of a decision of the commission, a question of law is presented "when the facts, as found by the commission and supported by competent legal evidence, permit only one conclusion." *DeNardo v. Fairmount Foundries Cranston, Inc.*, R.I., 399 A.2d 1229, 1234 (1979).

9. *See* Higgs, *Sudden, Severe, Emotional Shock That Can Be Traced to a Definite Time, Place, and Cause, and which Produces a Psychological Injury, Is Compensable*, 26 Drake L.Rev. 472, 474 n.20 (1976–77). A complete compilation of cases in which courts have considered whether compensation may be awarded for mental disorders allegedly induced by work-related stress is to be found in 97 A.L.R.3d 161 (1980).

it appears in the compensation act, it usually refers to incapacity for work. *Jones v. Grinnell Corp.*, 117 R.I. 44, 362 A.2d 139 (1976); *Parkinson v. Leesona Corp.*, 115 R.I. 120, 341 A.2d 33 (1975); *Ludovici v. American Screw Co.*, 99 R.I. 747, 210 A.2d 648 (1965). We have continually stressed that compensation is not paid for the injury but for the impairment of earning capacity. *Microfin Corp. v. DeLisi*, 111 R.I. 703, 306 A.2d 797 (1973); *Geigy Chemical Corp. v. Zuckerman*, 106 R.I. 534, 261 A.2d 844 (1970); *Peloso, Inc. v. Peloso*, 103 R.I. 294, 237 A.2d 320 (1968). An employer takes its workers as it finds them, and when the employee aggravates an existing condition and the result is an incapacity for work, the employee is entitled to compensation for such incapacity. *Clemm v. Frank Morrow Co.*, 90 R.I. 37, 153 A.2d 557 (1959).

Here, the commission, in awarding Beulah compensation, believed her psychiatrist when he testified that the office chaos that ensued following her employer's weekend move from Massachusetts to Rhode Island aggravated a preexisting psychiatric condition. Credibility and fact-finding are part of the commission's job. However, this award goes for naught because of the concern prompted by Chief Judge Breitel in *Wolfe v. Sibley, Lindsay & Curr Co.*, 36 N.Y.2d 505, 330 N.E.2d 603, 369 N.Y.S.2d 637 (1975), and the imposition by my brother of a standard calling for a "more dramatically stressful stimulus." With all due deference to my learned associate, this standard represents judicial legislation.

Rhode Island's compensation act expresses a legislative determination that compensation is to be awarded to an employee who "receives a personal injury arising out of and in the course of his employment, connected therewith, and referable thereto."

General Laws 1956 (1979 Reenactment) § 28–33–1. The General Assembly does not say that the worker whose earning capacity has been diminished because of a mental injury will receive compensation only in those instances when incapacity is the result of an unusually stressful situation.

I am aware of the concern that claims involving mentally disabled workers will encourage malingering, sham, and outright fraud, but these fears do not justify the denial of a genuine claim. Many assume that mental injuries, because of their very nature,[10] are more difficult to substantiate and are, therefore, less genuine than physical injuries, but modern legal and medical theory fails to lend credence to that assumption.

"The separate category reserved for 'physical' injuries has little support in psychiatric theory, which regards man as an integrated being. The rule is sometimes rationalized, however, by appeal to administrative considerations. It is contended, for example, that the 'physical' injury requirement will guarantee the genuineness of the claim. But use of this rule as a protective device places a heavier burden of proof on those suffering from mental disturbances without any basis for such a distinction. In fact, conscious simulation of the often complex patterns of psychoneurotic reactions may be easier to detect than certain feigned 'physical' injuries such as whiplash or back injury. While detection of falsified claims may be made difficult if the testimony of medical witnesses is partial or perjured, this danger seems no less present in cases where there has been a physical impact or injury." (Footnotes omitted.) Cohen, *Workmen's Compensa-*

---

10. At oral argument, counsel for Beulah's employer suggested an alternative solution to that provided by the majority. He referred us to *Townsend v. Maine Bureau of Public Safety*, 404 A.2d 1014 (Me.1979), where the Maine Supreme Court, recognizing the benevolent purposes of compensation legislation, ruled that Maine's statute, which does not require accidental injury, protects "even the eggshell. * * [E]ven those predisposed to mental injury should be able to recover for ordinary work-re-

lated stress to which others would not succumb." *Id.* at 1019. For those so predisposed, Maine would require proof of incapacity by clear and convincing evidence. With all due deference to the Maine Supreme Court, I see no necessity for a higher degree of proof. A compensation claim merely involves a civil proceeding in which the soundness of the claimant's case can be entrusted to the capable hands, eyes, and minds of those who serve on our Workers' Compensation Commission.

*tion Awards for Psychoneurotic Reactions,* 70 Yale L.J. 1129, 1137 (1961).

Intangibles always present problems. However, in heart-attack cases this court has said that it is immaterial whether the work performed by the employee involved unusual physical exertion, rather more important is whether there is a causal relationship between the work and the attack. *Williams v. United Wire & Supply Corp.,* 96 R.I. 487, 194 A.2d 686 (1963). Since the 1949 amendment, there have been many compensation cases involving back strain, and it has never been suggested that the claims should be rejected because the claimant was not subjected to an unusual or excessive stress or that the identified stress would not cause a back strain in the average worker. There is no logical basis for distinguishing between physical and emotional disability.

Recently, in *Digby v. Digby,* R.I., 388 A.2d 1, 4 (1978), in abolishing the doctrine of interspousal immunity and responding to the claim that the door was being opened to fraud and collusion, we said:

"Our legal system is not so inadequate that the resourcefulness of the judiciary and of the Legislature will be unable to counteract that potential and to respond as instances of fraud and collusion may occur."

In the same vein, protection against abuse in the award of workers' compensation lies in the competence and good judgment of the members of the commission, an organization that through the years has performed its duties in an exemplary fashion.

"In the last analysis, the problem of malingering is one of fact, which must be left to the skill and experience of medical and psychiatric experts, and of compensation administrators, who usually manage in time to develop considerable facility in detecting malingerers at the factfinding level." Larson, *Mental and Nervous Injury in Workmen's Compensation,* 23 Vand.L.Rev. 1243, 1259 (1970).

The result reached by the majority will undoubtedly win the plaudits of the state's editorialists [11] and industrialists,[12] but the majority's denial of Beulah Seitz's claim, I submit, represents a usurpation of the Legislature's prerogative, an unwarranted intrusion into the area of factfinding which by statute is reserved to the commission, and a disturbing distrust of those who practice within the science of psychiatry.[13]

I would affirm the commission's action and respectfully suggest to those who suffer from what might be described as "floodgate" or "Pandora" phobia that relief from such a condition, if required, should be afforded in the legislative chambers at the State House rather than here on the seventh floor of the Providence County Courthouse.

11. On May 2, 1981, an editorial appeared in both the Providence Journal and the Evening Bulletin entitled "Workers' Compensation tie vote should be appealed, overthrown." Those responsible for the editorial allude to the risk that "[d]isgruntled individuals unhappy with their jobs, could have a field day collecting benefits at their employers' expense while not working due to alleged emotional distress."

12. We acknowledge the amicus brief filed on behalf of the New England Telephone and Telegraph Company in which counsel asserts that recovery for Beulah would "tend to provide employees with general health insurance for every minor psychic shock incurred in the course of daily living" and ask that this court "establish stringent, readily ascertainable criteria which place employers on notice of the

objective standards they must meet under the Rhode Island workers' compensation laws."

13. In *State v. Correra,* R.I., 430 A.2d 1251, 1254 (1981), we recognized "the great advancements made in the psychiatric field" and specifically noted that "[j]udicial reliance upon psychiatric testimony in other areas of the law belies any concern that such evidence is not a sufficiently recognized and acceptable medical science capable of offering quality expert guidance." This recognition, I might add, was also responsible for our replacing the so-called *M'Naghten* Rule with the American Law Institute's standards for determining criminal responsibility. *See State v. Johnson,* R.I., 399 A.2d 469 (1979).