Robert **REGA**

v.

**KAISER ALUMINUM & CHEMICAL CORPORATION.**

**No. 80–569–Appeal.**

Supreme Court of Rhode Island.

May 10, 1984.

Raul L. Lovett, Marc B. Gursky, Lovett & Linder, Ltd., Providence, for plaintiff; Lauren E. Jones, Providence, on brief.

Bruce Q. Morin, Quinn, Cuzzone & Geremia, Providence, for defendant.

## OPINION

SHEA, Justice.

This is an appeal from a denial of workers' compensation benefits. The fundamental question involved is whether a "nervous breakdown" suffered by the employee was a work-related personal injury. We conclude that it was and therefore reverse.

The evidence in this case is uncontradicted. Robert Rega worked for Kaiser Aluminum & Chemical Corporation in the town of Portsmouth from 1950 until early July 1975. From 1950 to 1960 he was a union member and worked in various positions. In 1960 he was promoted into a management classification, first in the position of clerk foreman and then ultimately as foreman of a department where he was responsible for the supervision of twenty to thirty people on his shift. He performed his duties well and received appropriate raises. He was selected to fill a similar foreman position in the Bristol, Rhode Island, plant during a two-year vacancy of another foreman and also to cover during vacations of other plant foremen.

As a member of management, Rega was entitled to the benefits of pension plan B, which would give an employee pension benefits on reaching the "magic number 70." That number was the sum total of the number of years employed by Kaiser plus the employee's age. By July 1975 Rega had worked for Kaiser for twenty-five years and was nine months from his forty-fifth birthday, on which he would achieve the number 70.

On July 3, 1975, Rega was given one hour's notice that he was being laid off. He knew that for management personnel "laid off" was a euphemism for termination. "There is no lay off in management. They terminate you." Rega said he was "stunned." He sought out and spoke with the industrial relations officer John Petterson. He was told that the termination was in no way related to poor performance. Kaiser was simply "cutting back." However, at that time, employees were working in his department who had only two years' experience. Kaiser had even started new employees in his department a mere two or three weeks earlier.

Rega knew that over his twenty-five-year period of employment with Kaiser, layoffs

of hourly workers were not unusual. However, he had never heard of a single termination of this type involving a member of management in his position.

Rega asked that his contributions to the pension plan remain invested. He was told this was not possible. Within a month of his termination, he received a check for these funds in an amount of more than $11,000.

After his termination, Rega suffered insomnia. He could not accept his termination and repeatedly asked himself why. He said he felt good physically but that mentally he had difficulty accepting his situation. He lost weight and consulted his family physician, whom he continued to see for about a year.

In mid-November 1975 John Petterson called him from Kaiser and asked if he would like to come back to work to his old job. Rega was confused and could not decide to accept immediately. After a conversation with his wife, however, he called Petterson and did accept the offer. He immediately asked if he could get back into retirement plan B but was told that an answer could not be given at that time. About two months later Rega was told that he could not return the $11,000 to the retirement plan—that he would have to "start from scratch on plan B." All other job benefits, however, such as vacation and seniority rights, were restored as though there had been no interruption in his employment.

Upon returning to work, Rega said he felt "kind of excited." He became increasingly upset. He dwelled on the question of why he had been terminated, and he worried over the fact that he could be terminated again. He began to experience excessive sweating, tenseness, and weeping at work. About four months after he returned to work, he began to experience sensations of physical illness which would force him to leave work. He endured sleeplessness at night. In October of 1976 his family physician prescribed medication to relieve the physical symptoms he was experiencing during work. By the week of January 6, 1977, the medication was not providing him any relief. He was forced to leave work at midday on Monday and Tuesday; he worked a full day on Wednesday, but on Thursday he was unable to continue. He left work and immediately saw his family physician. At that time he broke down and appeared to have entered into a complete nervous collapse. The family physician referred him to Arnold M. Frucht, M.D., a psychiatrist, who examined him the same day and immediately admitted him to a day-care program at Newport Hospital. The day-care program was selected because of Rega's excessive fear of separation from his wife. He attended the program five full days a week for several weeks. At the time of the hearings, Rega was still seeing Dr. Frucht once a week.

The psychiatrist diagnosed Rega's condition as "chronic severe anxiety neurosis with severe depressive features." It was his opinion that the condition was causally related to Rega's treatment by Kaiser, that the condition was totally incapacitating at the time of Rega's breakdown and for a period of time thereafter, and that it continued to be partially incapacitating at the time of the hearing.

The physician testified that after working for Kaiser for twenty-five years, Rega's services were dispensed with on only one hour's notice and that he was furthermore later rehired but deprived of his rightful pension benefits. He felt used. He was anxious about working for Kaiser again because he feared that the company would do the same thing to him again. The physician stated that if the employer had actually set out to destroy Rega's self-confidence, it could not have done a better job. The employer offered no medical evidence to the contrary or any other explanation of Rega's situation.

The physician described gradual improvement but continuing marked disability and strong dependence by Rega on his wife for security. At the time the physician testified, Rega had reached a point where he

might be employable in the company of his wife selling flowers in an outdoor market or antiques at a stand or performing any similar non-stressful task.

The trial commissioner found that Rega had sustained an injury within the course of his employment due and referable thereto. That injury was a chronic anxiety neurosis and severe depressive reaction caused by the pressures of his work and the treatment to which Rega was subjected by his employer. The commissioner found Rega to be totally disabled from January 7, 1977, through November 15, 1978, and partially incapacitated thereafter, and he ordered weekly compensation and medical expenses to be paid.

Kaiser filed a timely appeal to the appellate commission, which reversed the trial commissioner. Although the appellate commission purported to reverse on the ground that the finding of causation was not supported by the evidence, the appellate commission's statement of the issue was,

"[U]nder what circumstances [is] an emotional psychiatric injury, as a result of an employee's apprehension about losing his job, * * * compensable."

The appellate commission concluded that to award compensation for an injury caused by fear of losing one's job would require reading into the Workers' Compensation Act something that the Legislature had not declared was compensable. It then went on to find that an emotional injury or depressive reaction caused by fear, apprehension, or worry over losing one's job, is not a personal injury arising out of one's employment within the contemplation of the Workers' Compensation Act.

■ In its decision, the appellate commission did not reject any of the trial com-

missioner's findings; therefore, the issue before us is one of law, not fact. *DeNardo v. Fairmount Foundries Cranston, Inc.*, 121 R.I. 440, 447, 399 A.2d 1229, 1233 (1979).

■ Kaiser asserts that this court's ruling in *Seitz v. L & R Industries, Inc.*, R.I., 437 A.2d 1345 (1981) is controlling. *Seitz* was decided before the Legislature amended G.L. 1956 (1979 Reenactment) § 28-34-2 of the Workers' Compensation Act by specifically adding mental injury to the list of occupational diseases.[1] This amendment did not really change the law in our opinion. It codified what we had held in *Seitz* —that to be entitled to compensation, an employee would have to prove that the mental injury and disability were caused by dramatically stressful stimuli that were not ordinarily present and expected in the workplace. *Seitz*, 437 A.2d at 1351. The stress complained of in *Seitz* did not meet this criterion. *Id.* 437 A.2d at 1352.

■ Applying the same criteria that this court used in *Seitz* to the facts of this case, however, brings us to a different result. The issue before us is not whether mental illness caused by worry over losing one's job is a compensable injury. Under *Seitz*, such disability would not be compensable. The crucial question is whether Rega's treatment by Kaiser "exceed[ed] the intensity of stimuli encountered by thousands of other employees and management personnel every day." *Id.*, 437 A.2d at 1351.

■ The evidence in this case establishes that the stimulus that precipitated the illness was the firing, rehiring, and deprivation of pension benefits just months before the pension was to become available. Rega had served his employer well for twenty-five years. The firing occurred on an hour's notice. The reason given, cutting

---

1. General Laws 1956 (1979 Reenactment) § 28-34-2(36) as amended by P.L. 1982, ch. 32, art. 1, § 8 reads:

"*Mental injury—Treatment as compensable injury.*—The disablement of an employee resulting from mental injury caused or accompanied by identifiable physical trauma or from a mental injury caused by emotional stress resulting from a situation of greater dimensions than the day-to-day emotional strain and tension which all employees encounter daily without serious mental injury shall be treated as an injury as defined in § 28-29-2(d)."

back, was blatantly untruthful, in Rega's opinion, in view of the retention of many far-less-experienced and junior employees. Fairly soon after the firing, Rega was rehired to his old position and restored to all benefits except his pension. Then, after two months of indecision, he was finally told that at age forty-five, after twenty-five years of faithful service, he must "start from scratch" to earn his pension.

The uncontradicted evidence establishes that Rega's mental illness and disability were caused by stress that exceeded the intensity normally encountered in the workplace. He is entitled to the protections and benefits provided by the Workers' Compensation Act.

For these reasons, the appeal is sustained, the decree of the appellate commission is reversed, and the case is remanded with directions to enter a final decree in accordance with the decree entered by the trial commissioner.