Helen F. MULCAHEY

v.

NEW ENGLAND NEWSPAPERS, INC.

No. 84–89–Appeal.

Supreme Court of Rhode Island.

Feb. 21, 1985.

William J. George, North Providence, for petitioner.

Guy J. Wells, Gunning LaFazia & Gnys Inc., Providence, for respondent.

OPINION

KELLEHER, Justice.

On Sunday, October 8, 1978, at approximately 10:30 a.m., Helen F. Mulcahey drove her husband, Edward F. Mulcahey, Jr., (Mulcahey) to his place of employment in Pawtucket, Rhode Island. There he picked up one of his employer's automobiles and drove to Schaeffer Stadium in nearby Foxboro, Massachusetts. Mulcahey's employer, New England Newspapers, Inc., was the publisher of a daily newspaper circulated in the Blackstone Valley area of this state and at that time called the Pawtucket Times (Times). For over a quarter of a century, Mulcahey was known to thousands of the Times readers as "Ted"

Mulcahey, the paper's sports editor. Upon arriving at the stadium, Mulcahey parked his car in the "press parking lot." He then spent the better part of the afternoon in the press box watching two National Football League professional football teams, the New England Patriots and the Philadelphia Eagles, do battle with each other. Mulcahey returned to his Pawtucket residence at about 5:45 p.m. When he sat down to supper, he told his wife "something funny happened to me at the game today." When one of the Mulcahey sons asked his father who won the game, the reply was "That team." Soon Mulcahey became incoherent, and within a short time he was admitted to Pawtucket Memorial Hospital. Mulcahey died five days later, on October 13, and the cause of death was listed as cerebral hemorrhage.

The wife subsequently sought workers' compensation, alleging that the hemorrhage was attributable to her husband's job with the newspaper. At a hearing before a trial commissioner, a member of the Workers' Compensation Commission rejected the wife's claim. She then appealed to an appellate commission, which overturned the denial and entered a final decree granting the wife's petition. The employer appeals.

At the hearing before the trial commissioner, Mulcahey's widow described her husband's normal daily routine as follows: arise at 5 a.m.; arrive at the Times at 6 a.m.; work until 12 p.m.; return home until 6:30 p.m.; leave to observe the sporting scene until 11 p.m.; go to the paper to write a story until 1 a.m.; and then back to bed to arise once again at 5 a.m.

The Times sports department consisted of Mulcahey and two other individuals, all of whom were quite conscious of the competition for the reader's eye and money. The trio, in the widow's words, "did the job that the Providence Journal did with a

much larger staff." Mrs. Mulcahey also explained that her spouse had been a diabetic for about six years and took a pill each day. He also took medication for high blood pressure.

One of Mulcahey's press-box companions, the sports editor of the Northampton [Massachusetts] Daily Gazette, testified that Mulcahey's Patriots-Eagles postgame behavior "was unusual." At the game's conclusion, the witness said, Mulcahey made no effort to visit the locker room to interview the coaches or the players. He made no effort to obtain a book furnished by the Patriots management to the press. The book contained a mimeographed play-by-play sheet for each of the four quarters of the game as well as a detailed analysis of the statistics for each team and the individual players. Such information, in the witness's opinion, was a "must" for an employee whose story was to be in a newspaper published on Monday morning.[1]

At the hearing before the trial commissioner, three physicians testified on behalf of the widow: the family physician, a cardiologist who saw Mulcahey when he was admitted to the emergency room at Pawtucket Memorial Hospital, and a specialist in hypertension. The specialist in hypertension was the last witness to offer testimony on behalf of the widow's petition. Six months later, the Times, through its counsel, advised the trial commissioner that it would rest without presenting any evidence of its own. Subsequently, a change of mind occurred, and the employer's motion to reopen for the sole purpose of taking the deposition of a cardiologist, a member of the faculty of Brown University's medical school, was granted. The deposition is part of the record. The sum and substance of the deponent's testimony was that it was his opinion that Mulcahey's presence at the football game did not precipitate or aggravate his preexisting high

1. Although the Times is an afternoon newspaper, it published morning editions on Saturdays and holidays. The Legislature has designated the second Monday of October as a special holi-

day known as Columbus Day. General Laws 1956 (1979 Reenactment) § 25–1–1. Monday, October 9, 1978, was Columbus Day.

blood pressure to the point where he suffered the cerebral hemorrhage that ultimately caused his death.

The trial commissioner in his decision discussed the testimony of the four physicians and was most impressed with the evidence given by the cardiologist who testified on behalf of the Times. The commissioner emphasized that there was no testimony that Mulcahey had exerted himself in any unusual manner while he was at Schaeffer Stadium on Sunday, October 8, 1978, or that the circumstances that day were any more or less exciting than any other events he had covered. In the commissioner's opinion, the fact that the hemorrhage began at the football game was "nothing more than happenstance."

▆ Initially, we shall consider the appellate commission's rejection of the trial commissioner's reliance on the testimony presented by the cardiologist who testified by deposition. In *Laganiere v. Bonte Spinning Co.*, 103 R.I. 191, 197, 236 A.2d 256, 259 (1967), and again in *Davol, Inc. v. Aguiar*, R.I., 463 A.2d 170, 173–74 (1983), we emphasized that even though G.L.1956 (1979 Reenactment) § 28–35–28 (1984 Cum. Supp.) purports to give the appellate commission the ability to reject factual findings made by a trial commissioner de novo, the commission, before disturbing findings based on credibility determinations, must first find that the trial commissioner was clearly wrong either because the commissioner was obviously mistaken in his or her judgment of the credibility of the witnesses or overlooked or misconceived material evidence in arriving at the conclusion reached.

As part of its investigation, a representative of the Times insurer interviewed a Providence Journal reporter who was present in the press box on the day of the Patriots-Eagles confrontation. The reporter told of talking to Mulcahey. According to the reporter, Mulcahey had no complaints of any illness. The reporter, when asked about any physical exertion, replied in the negative, agreeing that reporters were not required to run up and down to

the playing field because interviews were held in the clubhouse after the game, at which time the coach was available for questioning. A reporter could view the game on closed-circuit TV, and each reporter was assigned a seat in the press box, which was situated high above the grandstand. Elevators took the reporters to and from the press-box area.

In direct examination the Times cardiologist expressed the opinion that Mulcahey's hemorrhage was in no way related to his presence at the Patriots-Eagles game, and that the hemorrhage could not be considered to be an incident of his occupation. The expert was then asked on cross-examination if the reporter's statement to the investigator played any part in the conclusions expressed during direct examination. The cardiologist replied, "I based my entire opinion on that." Consequently, the appellate commission properly rejected the commissioner's findings because the statement had never been properly admitted into evidence since the reporter had never been subject to cross-examination.

The Times does not challenge the commission's rejection of the trial commissioner's choice of experts, but it does argue that the other three physicians who did testify offered no competent evidence upon which the commission could base its conclusion. In its appeal the Times faults the appellate commission's award of compensation because, in its words, "none of the experts who testified for petitioner could point to a single incident which occurred on October 8, 1978 which precipitated or contributed to the cerebral bleeding which caused [her husband's] death." The employer also points to an absence of any evidence that the October 8, 1978 contest differed in any way from the many other sporting events that "Mulcahey covered" in his thirty-three-year career as an editor and scribe.

▆ The Times's emphasis on the lack of evidence about any exciting event that might have occurred at the stadium ignores

the fact that Rhode Island is one of the few states in which the workers' compensation statute since 1949 has not required proof of an accidental injury before compensation can be paid to an injured worker.[2] In fact, in heart-attack cases this court has said that it is immaterial whether the work performed by an employee involved unusual physical exertion. Rather, the crucial issue is whether there is a causal relationship or nexus between the work and the attack. *Gaines v. Senior Citizens Trans., Inc.,* R.I., 471 A.2d 1357 (1984). It must be kept in mind that in workers' compensation cases we do not equate the term "causal relationship" with the term "proximate cause" as found in negligence actions. Here, it is enough if the conditions and nature of the employment contribute to the injury. *Boullier v. Samsan Co.,* 100 R.I. 676, 219 A.2d 133 (1966); *Palmer v. Friendly Pharmacy, Inc.,* 84 R.I. 98, 121 A.2d 665 (1956).

⬛ In resolving the present controversy, the question is whether the principles involving heart attacks should be applied to other failures of the cardiovascular system.[3] The answer is unquestionably yes because an employer takes its workers as it finds them, and when the employee aggravates an existing condition and the result is an incapacity for work, the employee is entitled to compensation for such incapacity. *Clemm v. Frank Morrow Co.,* 90 R.I. 37, 153 A.2d 557 (1959).

⬛ Our duty at this point is quite simple. We must examine the record and determine whether there is any legally competent evidence to support the appellate commission's factual finding that Mulcahey's death was due to a cerebral hemorrhage resulting from the aggravation of his pre-existing hypertension. *Worcester Textile Co. v. Morales,* R.I., 468 A.2d 279

(1983). Mulcahey's fellow editor spoke of the difficulty of meeting the deadline—the time at which the paper's sports section would have to be written, edited, and the pages "actually pasted up," and the presses were ready to roll. All the time, the witness said, "the clock is staring at you and saying, you have to be out of here at X hour."

The hypertension expert had been engaged in this area for almost sixteen years, during which he engaged in the study, research, and treatment of this malady. In response to a hypothetical question in which the specialist was asked his opinion about whether the incidents of Mulcahey's employment and his stressful work style caused or contributed to his hypertension, aggravating it to a point where he suffered a cerebral hemorrhage and died, the response was in the affirmative. The specialist then pointed out that Mulcahey's blood pressure was of a type that would go up whenever he was under stress so that repeated episodes of meeting a deadline aggravated the blood pressure and certainly contributed to the hemorrhage that caused his death.

The certified cardiologist who examined Mulcahey shortly after his admittance to the hospital's emergency room attributed Mulcahey's death to a "massive intercerebral hemorrhage." This witness expressed the opinion that the stress of meeting numerous deadlines "probably aggravated" the deceased's hypertension; and, speaking in terms of reasonable medical certainty, the cardiologist expressed the opinion that the increased hypertension was responsible for the intracranial bleeding which the witness had previously described as "massive."

---

**2.** *See* Higgs, *Sudden, Severe, Emotional Shock That Can Be Traced to a Definite Time, Place, and Cause, and which Produces a Psychological Injury, Is Compensable,* 26 Drake L.Rev. 472, 474 n. 20 (1976–77).

**3.** The same question was posed by the Florida Supreme Court in *Richard E. Mosca & Co. v. Mosca,* 362 So.2d 1340, 1341 n. 1 (Fla.1978). The response was in the affirmative but the result was negative so far as the employee was concerned because proof of accidental injury is required by Florida's compensation act.

At one point in his cross-examination, the family physician, after expressing difficulty with understanding the cross-examiner's inquiry as to the absence of a "shall we say precipitating incident in this case," responded, "If you're referring to final event, I honestly believe that the precipitating cause of death was his being present at a Patriots game, with the atmosphere and the circumstances * * *." Later, the witness, in response to a further inquiry from the cross-examiner as to whether the family physician was saying that Mulcahey's work caused his death, answered, "I said the circumstances at the game caused his death, the workload, I'd say it's the probable cause of his death." Earlier, in direct examination, this witness made it clear that he was quite familiar with Mulcahey's work routine, particularly his working in "the wee hours of the morning, trying to make a deadline." Mulcahey's stressful employment, he said, aggravated both his hypertension and diabetes, "and the three of them escalate vascular disease." The commission obviously believed the medical testimony to which we have alluded, and this testimony is legally competent evidence that creates the requisite nexus between Mulcahey's job and his inability to meet the Columbus Day deadline.

Two other issues raised by the Times merit a brief comment. The Times contends that the commission award is inconsistent with the dictates of *Seitz v. L & R Industries, Inc.*, R.I., 437 A.2d 1345, 1347 (1981), in which an employee sought compensation benefits because she had become so mentally upset about work conditions that she terminated her employment. In *Seitz* it was noted that there are three types of psychic injury: the first is physical injury caused by mental stimulus, the second type is psychic injury caused by physical trauma, and the third type is mental injury produced by a mental stimulus where neither physical causes nor physical results exist. *Seitz's* injury fell within the third category, and a majority of this court ruled that *Seitz* could not prevail because the mental distress she suffered "did not exceed the intensity of stimuli encountered by thousands of other employees and management personnel every day. If psychic injury is to be compensable, a more dramatically stressful stimulus must be established." *Id.* 437 A.2d at 1351. The holding of *Seitz* affords no support here because Mulcahey's disability falls within the first category—physical injury caused by mental stimulus, an area in which, *Seitz* notes, courts uniformly find compensability.

The final phase of the Times appeal deals with the charge that the appellate commission erred when it failed to remand the case to the trial commissioner pursuant to the provisions of § 28–35–28, where, in its pertinent portion, the statute provides that the appellate commission "may remand" a case to a trial commissioner for further consideration of factual issues that the appellate commission may raise, including the taking of additional evidence or testimony. The statute then goes on specifically to provide that the question of a remand lies within the "sole prerogative" of the commission. Putting aside the phrase "sole prerogative" and assuming that the remand invokes the exercise of sound discretion by the commission, there is absolutely nothing in this record that would warrant any critical comment on the commission's failure to remand.

The employer's appeal is denied and dismissed, the decree appealed from is affirmed, and the case is remanded to the Workers' Compensation Commission.

WEISBERGER, J., did not participate.